*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BILLY SLAGLE,

    *Petitioner-Appellant,*

  *v.*

             No. 04-3490

MARGARET BAGLEY, Warden,

    *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00316—Peter C. Economus, District Judge.

Argued: January 26, 2006

Decided and Filed: August 8, 2006

Before: BOGGS, Chief Judge; MOORE and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kelly L. Culshaw, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Kelly L. Culshaw, Joseph E. Wilhelm, Robert K. Lowe, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

  ROGERS, J., delivered the opinion of the court, in which BOGGS, C. J., joined. MOORE, J. (pp. 21-25), delivered a separate dissenting opinion.

_____

## OPINION

_____

  ROGERS, Circuit Judge. Petitioner Billy Slagle, who was sentenced to death by an Ohio jury for the 1987 aggravated murder of Mari Anne Pope, appeals the judgment of the district court denying his petition for post-conviction relief brought pursuant to 28 U.S.C. § 2254. Slagle broke into his neighbor Pope's house on August 13, 1987, because he wanted to steal something for the following day's drinking. Pope was babysitting two neighborhood children. Ultimately, Slagle went into Pope's bedroom and, after she woke up, stabbed her seventeen times in her chest with her sewing scissors. The two children escaped, called for help, and identified Slagle. The police found Slagle at the scene holding the bloody scissors, and Slagle later described his actions that night in

1

detail.  Although Slagle admitted at trial that he killed Pope, he argued that, due to his voluntary intoxication from alcohol and marijuana, he did not have the requisite intent for aggravated murder. The jury, nevertheless, sentenced him to death for aggravated murder.

After the Ohio courts affirmed Slagle's sentence and denied Slagle post-conviction relief, Slagle petitioned the federal district court for habeas relief in December 2001.  The court denied his petition.  A certificate of appealability (COA) has been granted to consider the following four issues: (1) prosecutorial misconduct, (2) ineffective assistance of trial counsel at the guilt phase of trial for failure to object to certain comments of the prosecution, (3) ineffective assistance of counsel at the penalty phase of trial for failure to object to the prosecution's alleged use of nonstatutory aggravating factors, and (4) ineffective assistance of appellate counsel for failure to challenge trial counsel's decision not to object to the prosecution's closing arguments.  Slagle also argues that this court improperly refused to extend his COA to include two additional issues.  We affirm.

## I.

*A.      Facts and Trial*

When reviewing Slagle's case on direct appeal, the Supreme Court of Ohio considered the trial record and made the following factual findings, which, according to 28 U.S.C. § 2254(e)(1), are presumed correct unless rebutted by clear and convincing evidence:

> In the early morning hours of August 13, 1987, the victim Mari Anne Pope was awakened in her home by appellant. Two children, who she had agreed to watch for her neighbors, were also awakened. The children awoke to the voice of Mari Anne inquiring as to who this person was that had entered her home. A man's voice angrily threatened her and ordered her to roll onto her stomach.  The man asked if there were others in the house, to which she replied that there were two children upstairs. The man told the victim not to move and that he had a knife at her back.  The children then heard Mari Anne begin to pray.  The man responded by ordering her to stop praying.

> The children recognized the voice and knew the man as Billy Slagle, who lived next door.  They first sought to hide, and then to escape.  They scurried through the hall and out the back door.  One of the children looked into the bedroom and observed Slagle sitting on top of the victim, who was lying upon her stomach.  Slagle had on only his underwear.  As the children exited, the victim could be heard screaming.

> The children were admitted into a neighbor's home and police were called.  Police officers arrived momentarily and as they moved around the house, shining a flashlight into the windows, one officer observed a man standing in the rear bedroom.  The officer entered and observed appellant attempting to hide in the dining room, armed with blood-covered scissors.  After ordering appellant to discard the scissors and lie face down on the floor, the officer placed handcuffs on him.

> The officer then went into the bedroom.  He observed Mari Anne Pope lying across the middle of the bed.  Her nightgown was pulled up around her neck.  She was drenched in blood with large holes in her body.  On the floor lay Mari Anne's broken rosary, and appellant's tank-top T-shirt.

> The officer called to his companion, telling him to call for medical treatment and to take custody of the handcuffed man on the dining room floor.  The other officer responded that there was no one on the dining room floor and both officers began to search.  Appellant had gotten up and hidden himself in a hallway closet.  When the officer passed the closet door in this as yet darkened home, appellant burst from the closet and sought to escape.  The

first officer to react testified that appellant was very quick and agile. The officer was unable to subdue appellant until two other officers entered the fray. Appellant was observed to have blood on his hands and clothing. He also had a number of superficial scratches and bruises.

Despite efforts to save her, Mari Anne Pope was pronounced dead at 6:00 a.m. The coroner reported that she had been stabbed seventeen times, with many of the stab wounds having been inflicted in and around her chest area. There were four stab wounds in her abdomen, five in the upper and lower extremities, with eight to the chest area, including wounds to the right atrium, pulmonary artery and right lung. She had also been severely beaten about her head and face.

At 10:00 a.m. the same day, Detective John J. McKibben interviewed appellant, after having first advised him of his Fifth Amendment rights. At first, appellant claimed to have no knowledge of the events of that morning. After being reminded that he had been arrested in the victim's home, appellant described his actions on the night of August 12 and the morning of August 13 in some detail.

*State v. Slagle*, 605 N.E.2d 916, 920-21 (Ohio 1992).

Slagle told Detective McKibben that he entered through a window and proceeded to the basement, looking for something to steal. Slagle said that he took his shoes off and then went upstairs to the room in which the children were sleeping. He next went to Pope's bedroom. As he was searching in her purse, Pope woke up and began screaming. He placed his hands on her mouth to quiet her. Slagle said that they began fighting for the sewing scissors that were next to the bed, and that he ultimately stabbed her "maybe 3 times." JA 464. Slagle also admitted that he tried to rape Pope, but he said that he could not get an erection. After the murder, he saw a flashlight shining into the window, so he ran into a kitchen closet, where the police found him. He said that he was sorry for what had happened. Slagle provided the patrolmen with the name and address of his friend Mike Davis, and with Slagle's social security number, date of birth, and residence. Detective McKidden said that, although Slagle's eyes were glassy, McKidden smelled no alcohol on Slagle's person at the scene or the next morning.

At trial, the evidence revealed that eighteen-year-old Slagle spent the afternoon and evening of the murder with his friends Mike Davis, Kim Jones, and William Vivolo. It is unclear how much Slagle drank that night. Davis testified that he had about twenty beers that day and night and that he and Slagle "always kept up with each other." Slagle also had shots of whiskey and smoked about $50 worth of marijuana. Mike Davis's sister, Andrea, arrived later. She testified that by the early morning Slagle's eyes were bloodshot and that he was slurring his speech. Slagle, according to Mike Davis however, was not staggering, vomiting, or falling over. He left in the early morning on a bicycle and rode for two miles to get home.

Slagle chose to testify. He stated that he broke into Pope's house to steal something so that he would have money for alcohol the next day. He did not recall any events after entering Pope's house until he was fighting with her and holding bloody scissors. He only recalled stabbing Pope once, and he testified that he did not know why he killed her.

On cross-examination, the prosecution asked several questions that Slagle now challenges. The prosecution asked Slagle about his education and work history. The State then asked Slagle how he made money when he was not working. Slagle responded that he sold marijuana to anyone. The State asked whether he sold marijuana to children, and Slagle testified that he did not.

When the State asked, over defense counsel's objection, whether Slagle had ever broken into a house to get money, Slagle responded that he had done so twice. The prosecution also asked

whether he supported his family or whether his family supported him. Slagle answered that he was not responsible for anyone.

The State later asked Slagle whether he knew what a rosary was, whether Pope began to pray as he attempted to rape her, whether he told her to shut up, and whether he liked and said prayers. Slagle testified that he did not remember her praying, that he saw nothing wrong with prayers, and that he says prayers.

The prosecution then asked Slagle whether he would have murdered the police officer at the scene, JA 652, murdered the children, JA 654, and taken the scissors home to "use them in the next—," JA 656. Defense counsel's objection cut off the prosecutor. The court sustained the objection, told the prosecution that "the question is highly improper[,]" and instructed the jury to disregard the inquiry. JA 654-56. Near the end of the cross-examination, when Slagle responded that he did not think that Pope scratched his face, the prosecution responded, "Policemen don't scratch. Isn't that a fact?" JA 657. The trial court sustained defense counsel's objection as to whether it is a fact that policemen scratch.

Throughout the trial, the defense's primary argument was that Slagle was too drunk to form the intent to murder. The defense called expert witnesses to testify to Slagle's alcoholism and to the fact that a high level of intoxication can preclude one from being able to form intent. The State responded with its own expert who testified that alcohol is processed rapidly in the body and that consumption of a large amount of alcohol does not guarantee that an individual will remain intoxicated at a future time. The trial judge instructed the jury that evidence of intoxication was "admissible for the purpose of showing that the defendant's mind was in such condition that he was not capable of forming the specific intent to kill . . . Pope." JA 707.

Slagle now challenges several comments and insinuations that the prosecution made during its closing arguments at the end of the guilt phase of the trial. Slagle's counsel did not object to the following comments: that Slagle had previously broken into homes and sold drugs, *see, e.g.*, JA 668, 679, 687, 695; that "It's a damn good thing the kids didn't wake up[,]" JA 670; and that Slagle had "the nerve to tell [the jury] 'I pray[,]'" JA 670. Slagle also now challenges, but did not object at trial to, the prosecution's speculation that one walking on floorboards would cause the floor to creak, JA 667; the prosecution's suggestion, by saying repeatedly that Slagle killed Pope to prevent her from identifying him, that Slagle had been charged with committing murder to escape "detection, apprehension, trial, or punishment" under Ohio Revised Code § 2929.04(A)(3), *see* JA 667, 670, 675-76; the prosecution's vouching for the credibility of several state witnesses (*e.g.*, "I put my money on the homicide detectives[.]"), JA 692, 701, 671; and the prosecution's speculation as to Pope's mental state before her death, JA 670 ("She was ready to meet God.").

Slagle's counsel, however, did not sit idly by during the State's closing argument. Defense counsel objected, almost always successfully, to the following statements that Slagle now challenges: that "It is a good thing that he didn't know Howard could identify him[,]" JA 672; that Slagle was one of the "greatest threats against community and civilization[,]" JA 702; that a defense witness offered "only liberal quack theories[,]" JA 700; that the defense's experts were called only to generate sympathy for Slagle, JA 682; that defense witness Mike Davis was "an admitted drug user" who "crawled out of a hole[,]" JA 693; that defense counsel was in a "mad scramble to salvage [Slagle's] credibility[,]" JA 691; and that defense counsel coached Slagle not to remember events by framing questions in the form of "Do you remember that, Billy?" JA 688. Defense counsel also objected to the prosecution's implication that Slagle had a tolerance to alcohol, JA 666; the prosecution's reference to an expert's statement made outside the record that "the body doesn't lie[,]" JA 693; and the prosecution's improper comparison of Slagle to bank robbers when using a bank-robbery analogy, JA 697-98.

After the guilt phase of the trial, the jury convicted Slagle of aggravated murder with two death-penalty specifications of committing murder in the course of aggravated burglary and aggravated robbery. The jury also convicted Slagle of aggravated burglary and aggravated robbery. The jury, however, acquitted him of attempted rape.

The penalty phase commenced about three weeks later. Slagle's counsel called Slagle's mother, father, and sister to testify that his alcohol abuse had changed him from a well-behaved child. The testimony revealed that Slagle's childhood was far from ideal. His parents divorced when Slagle was three years old, and he attended several schools and changed residences fifteen to twenty times. Slagle started using drugs and alcohol by the age of thirteen.

At the age of seventeen, Slagle received inpatient treatment for alcoholism after being arrested as a passenger joyriding in a stolen car. Although testing revealed that he had above-average intelligence, Slagle dropped out of high school after failing the eleventh grade for the second time. He held various jobs for short periods of time before settling into a pattern of drinking every day. Dr. Kurt A. Bertschinger, M.D., testified that Slagle was predisposed to be an alcoholic because of his family history and other factors. He also testified that Slagle could be treated in jail. The court's psychologist for competency and sanity, Dr. Thomas W. Hall, Ph.D., testified that Slagle was an alcoholic and that his judgment was impaired at the time of the crime.

Finally, Slagle made a brief unsworn statement, apologizing for Pope's death and requesting that the jury not give him the death penalty. The defense submitted several exhibits into evidence. The defense was permitted to make the first and last of the arguments to the jury.

Slagle challenges several comments that the prosecution made during its closing argument at the sentencing phase and claims that the State was referring to nonstatutory aggravating factors. *See* Petitioner's Br. at 35. The State first said that Slagle was a young murderer because he was 19 years old at the time of trial. Over defense counsel's objection, the prosecution asked the jurors whether Slagle sympathized with Pope or showed her any mercy. The prosecution referred to several circumstances of the murder and its brutality. At one point, after detailing the circumstances of the crime, he asked the jury, "How aggravating is that?" JA 833. In response to Slagle's evidence that he came from a broken home and had an alcohol problem, the State told the jurors, "We all know people from divorced homes. We all know people who have had alcohol problems either in the present or in the past. And they chose and they lead full and functional lives." JA 838. Slagle also argues that besides these comments, the prosecutorial misconduct from the guilt phase of the trial infected the sentencing proceedings. *See* Petitioner's Br. at 34-35.

After deliberating, the jury recommended the death penalty. The trial court agreed and sentenced Slagle to death for the aggravated murder of Pope. The court also sentenced Slagle to concurrent terms of imprisonment for aggravated robbery and burglary.

B.      *Direct and Post-Conviction Review*

Slagle brought twenty-five assignments of error to Ohio's Eighth District Court of Appeals, but that court affirmed his conviction and sentence. *See State v. Slagle*, No. 55759, 1990 WL 82138 (Ohio Ct. App. June 14, 1990). On appeal, Slagle challenged the prosecutorial misconduct at trial, *see id.* at *21 (listed in the appendix to the opinion as assignments VI and IX), and during the penalty phase, *see id.* at *22 (listed as assignment XVI). He also argued that he was deprived of effective assistance of counsel during both phases of his bifurcated trial. *See id.* at *22 (listed as assignment XIV).

The Supreme Court of Ohio affirmed his conviction in 1992. *See State v. Slagle*, 605 N.E.2d 916 (Ohio 1992). With respect to the issues presented for appeal, the state supreme court held that improper comments, if any, by the prosecution did not render "the trial fundamentally unfair." *See*

*Slagle*, 605 N.E.2d at 925. The state court divided the comments that Slagle challenged into three categories: (1) questions by the prosecution to which defense counsel did not object, (2) questions by the prosecution to which defense counsel did object, and (3) comments, including those to which defense counsel did and did not object, made by the prosecution during closing argument. *See id.* at 924-27. The state court reviewed for plain error the "approximately seventeen statements and questions" to which defense counsel did not object. *See id.* at 925. The court first determined that there was no plain error and then stated that "these comments did not render the trial fundamentally unfair." *See id.* As for the questions to which defense counsel objected, the state court held that there was no error, and "[t]o the extent that the prosecutor may have crossed the line, any error was harmless beyond a reasonable doubt." *See id.* at 926. Finally, the state court considered the challenged comments made in closing argument. The court stated, "Appellant objected to a number of these allegedly improper comments." *See id.* The state court then held that "while some of the remarks made by the prosecutor may have been somewhat improper, the argument as a whole did not taint the fairness of [the] trial." *See id.*

Slagle then petitioned the Supreme Court of the United States for a writ of certiorari, but the Supreme Court denied his petition. *See Slagle v. Ohio*, 510 U.S. 833 (1993).

After he had exhausted his direct appeals, Slagle sought post-conviction relief in Ohio state courts. The trial court denied his motion to vacate or set aside judgment and/or sentence pursuant to Ohio Revised Code § 2953.21. *See* App. to Request for COA, Vol. II, Exh. O. The state appellate courts also denied relief. *See State v. Slagle*, No. 76834, 2000 WL 1144947 (Ohio Ct. App. Aug. 10, 2000); *State v. Slagle*, 739 N.E.2d 815 (Ohio 2000).

The state court of appeals, in 1994 and 2002, denied Slagle's motions to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B). *See* Journal Entry (Ohio Ct. App. Sept. 1, 1994) in App. to Request for COA, Vol. II, Exh. R; *State v. Slagle*, No. 55759, 2002 WL 1335630 (Ohio Ct. App. May 29, 2002). The Supreme Court of Ohio affirmed. *See State v. Slagle*, 651 N.E.2d 937 (Ohio 1995) (per curiam); *State v. Slagle*, 779 N.E.2d 1041 (Ohio 2002) (per curiam).

On December 21, 2001, Slagle filed a petition under 28 U.S.C. § 2254 for federal post-conviction relief in the district court. Slagle initially brought six challenges, but he later amended his complaint to include a seventh challenge that expanded the grounds for his claim of ineffective assistance of appellate counsel. The district court denied all of his claims without granting an evidentiary hearing. The district court decided not to engage in a procedural default analysis that the State advocated. Addressing the merits, the district court held that the state courts' disposition of Slagle's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, federal law and that the State's reference to nonstatutory aggravating factors during the penalty phase of the trial was at most harmless error. The district court also held that any error in the jury instructions during the guilt and penalty phases did not entitle Slagle to relief. Finally, the district court held that there was no ineffective assistance of counsel at either the guilt phase or penalty phase of the trial, or on appeal.

The district court granted a COA on four issues. The first issue is whether Slagle's trial was rendered fundamentally unfair by the prosecution's assault on Slagle's character, statement of facts outside of the record, reference to nonstatutory aggravating factors, denigration of defense witnesses and counsel, and vouching for prosecution witnesses. The second issue is whether defense counsel was ineffective at the guilt phase of trial for failing to object to various prosecutorial actions, statements, and evidence. The third issue is whether defense counsel was ineffective at the penalty phase for failing to object to the prosecution's reference to nonstatutory aggravating factors. The final issue is whether Slagle's appellate counsel was ineffective for failing to address trial counsel's decision not to object to the State's closing arguments at both the guilt and sentencing phases.

On January 7, 2005, this court refused to extend Slagle's COA to include any other claims. *See Slagle v. Bagley*, No. 04-3490 (6th Cir. Jan. 7, 2005) (order). Slagle petitioned the Supreme Court of the United States to review this court's denial of an extended COA, but the Supreme Court denied his petition for a writ of certiorari on April 18, 2005. *See Slagle v. Bagley*, 544 U.S. 982 (2005). Therefore, we will consider the four issues certified for appeal by the district court.

## II.

When considering the district court's denial of Slagle's § 2254 petition, this court reviews legal conclusions de novo. *Williams v. Bagley*, 380 F.3d 932, 941 (6th Cir. 2004). The district court, in this case, made no independent factual findings or credibility determinations. Because the district court instead based its findings on the trial transcript, this court reviews the district court's factual findings de novo as well. *See id.*

This court's de novo review does not, however, extend to the state court's conclusions. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs review of Slagle's petition, filed on December 19, 2001, because Slagle filed it after the statute's effective date of April 24, 1996. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). This court may grant Slagle's petition only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is contrary to federal precedent "if the state court arrives at a conclusion that is opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state-court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[C]learly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Instead, it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Id.* A state court moreover does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent; it may hold a view that is different from this court or another federal court. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). Ultimately, AEDPA's highly deferential standard requires that this court give the state-court decision "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

Applying these principles to Slagle's petition, we conclude that the Supreme Court of Ohio did not unreasonably apply federal law as determined by the Supreme Court when the state supreme court determined that improper comments made by the prosecution did not render either phase of Slagle's trial fundamentally unfair. Although Slagle challenges more than thirty comments made by the prosecution during the trial, only fifteen of those comments were improper. Of the fifteen improper comments, none of the improper comments were made during the sentencing phase of Slagle's trial, held about three weeks after the guilt phase. These improper comments were made in the context of a strong evidentiary case against Slagle, were almost all minimally prejudicial, were not extensive, and were not repeated. Because Slagle's prosecutorial misconduct claim fails, his remaining, derivative claims for ineffective assistance of counsel also fail. Finally, Slagle's request that we reconsider our earlier order not extending his COA is untimely and therefore denied.

## III.

As a preliminary matter, procedural default does not preclude our review of Slagle's claim for prosecutorial misconduct. The warden argues that Slagle cannot challenge seventeen of the prosecution's alleged improper comments because Slagle failed to make a contemporaneous objection to those statements at trial. Although Ohio's contemporaneous objection rule can be an adequate and independent state ground that is sufficient to foreclose Slagle's challenges to those comments, *see Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Williams v. Bagley*, 380 F.3d at 968-69, two considerations counsel against applying a procedural bar to his challenges.

First, the warden's objection in her brief to this court was insufficient because she has not identified with specificity which statements are allegedly defaulted. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (holding that the state may waive the affirmative defense of procedural default by failing to assert it). The warden merely says that "17 of the 24 statements of alleged misconduct" are procedurally defaulted even though, by our count, Slagle challenges more than thirty statements on this habeas appeal. *See* Respondent's Br. at 7-8. It is true that the state supreme court held that "approximately seventeen statements . . . were not objected to at trial." *Slagle*, 605 N.E.2d at 925. But, not only did the state supreme court fail to specify exactly the number of statements not objected to, but the court did not identify the seventeen statements to which it referred. Moreover, the supreme court suggested that Slagle, on direct appeal, challenged other comments to which he failed to object at trial. When discussing the comments made by the prosecution at closing argument, the state supreme court stated, "Appellant objected to a number of these allegedly improper comments," *see id.* at 926, and then proceeded to rule on the merits, *see id.* at 926-27. Simply put, we cannot identify which statements the state contends are procedurally barred. The warden's vague assertion of the procedural default defense is not sufficient to bar federal review.

Second, it is unclear the extent to which the Supreme Court of Ohio reached the merits of the prosecutorial misconduct claim instead of relying on a procedural bar. *See Biros*, 422 F.3d at 387 (stating that default based on application of an adequate and independent state ground requires that the state actually enforce the independent state ground at issue). The confusion arises because a prosecutorial misconduct claim requires evaluation of the cumulative effect of improper comments made during the course of an entire trial. *See Berger v. United States*, 295 U.S. 78, 84-89 (1935) (considering the trial as a whole when determining whether improper statements by the prosecutor mandated a new trial). The state supreme court, however, evaluated separately (1) the questions to which defense counsel did not object (reviewed under a plain error inquiry), (2) the questions to which defense counsel did object, and (3) all challenged comments, whether or not objected to, during closing argument. *See Slagle*, 605 N.E.2d at 924-27. The Supreme Court of Ohio reached the merits of Slagle's prosecutorial misconduct claim as to the comments to which his counsel objected and to all comments made during closing arguments challenged on appeal. *See id.* at 926-27. Moreover, the state court addressed the merits of the claim as to the comments to which the defense did not object at trial by applying the federal "fundamentally unfair" standard. *See id.* at 925 ("Even taken together, these comments did not render the trial fundamentally unfair."). Thus, we cannot be sure which challenges were procedurally defaulted in the state courts or the precise extent to which the state court relied on a procedural bar in deciding the issue of prosecutorial misconduct. These considerations convince us that, in the context of this case, it is preferable, if not required, that we consider each comment challenged in Slagle's prosecutorial misconduct claim, notwithstanding any procedural default with respect to a subset of the challenged comments.

**IV.**

Although several of the prosecution's comments during Slagle's trial were improper, the Supreme Court of Ohio did not unreasonably apply federal law by determining that the prosecutorial misconduct in this case did not render Slagle's trial fundamentally unfair in violation of the Fourteenth and Eighth Amendments. The correct inquiry is whether the improper comments or actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The issue is not whether the comments are improper in and of themselves. The Supreme Court of Ohio applied this standard by asking whether the prosecution's comments "render[ed] the trial fundamentally unfair." *Slagle*, 605 N.E.2d at 925. The Ohio courts thus applied the correct constitutional standard, and the only issue for this court is whether the Ohio courts unreasonably applied federal law.

To determine whether the Supreme Court of Ohio reasonably applied the federal standard in holding that prosecutorial misconduct did not render Slagle's trial fundamentally unfair, this circuit employs a two-prong test. *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). First, this court determines whether the prosecution's conduct or remarks were improper. If the answer is affirmative, then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally. *Id.*

In reviewing this case, we are mindful of the Supreme Court's admonitions that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor," *Smith v. Phillips*, 455 U.S. 209, 219 (1982), and that "the appropriate standard of review for . . . a claim [of prosecutorial misconduct] on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden*, 477 U.S. at 181 (internal quotations omitted). Moreover, the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly*, 416 U.S. at 645. Our review of the challenged prosecutorial statements, in light of the Supreme Court's precedent, convinces us that only about half of the statements were improper and that these improper statements, in the context of a strong evidentiary case against Slagle, were not deliberate or sufficiently prejudicial to warrant a new trial or sentencing hearing. The Supreme Court of Ohio therefore did not unreasonably apply applicable federal law.

*A.*     *Improper Comments*

We have grouped the alleged improper comments that Slagle challenges into the five categories listed in the COA: character assault, facts outside of the record, nonstatutory aggravating factors, denigration of defense counsel and witnesses, and vouching for prosecutorial witnesses. With few exceptions, *see Slagle*, 605 N.E.2d at 925-26, the state supreme court did not explicitly determine which of the challenged statements were improper, *see, e.g.*, *id.* at 926 ("After carefully reviewing the entire argument, we conclude that while some of the remarks made by the prosecutor may have been somewhat improper, the argument as a whole did not taint the fairness of appellant's trial."). Of the challenged statements, fifteen were improper.

*1.*     *Character Assault*

Only two of the prosecution's comments concerning Slagle's character were improper. First, the prosecution's inquiry as to whether Slagle sold drugs to children was not improper. *See* JA 636. The prosecution began his questioning by asking Slagle how he made money. This question was

relevant because it was probative of whether Slagle had any motive to commit aggravated burglary and robbery. In response, Slagle informed the court that, when he was not working, he sold drugs to "anybody that wanted to buy it." The State then inquired whether Slagle sold drugs to children or teenagers. By denying that he sold drugs to children and affirming that he would sell to teenagers, Slagle was able to demonstrate that he sold only to teenagers and adults. The prosecution's question was a relevant follow-up question to Slagle's response regarding how he made money, and allowed Slagle to rehabilitate his testimony. *See* Ohio R. Evid. 611(B) (cross-examination is "permitted on all relevant matters and matters affecting credibility"). The question concerning whether Slagle sold drugs to children, therefore, was not improper.

In his brief, Slagle mischaracterizes the nature of the prosecution's inquiry. He states that "[t]here is no implication that drug dealings were related to . . . Pope's murder. Rather, this information was offered to demonstrate that Slagle was a bad person . . . ." Petitioner's Br. 13. The prosecution did not offer any evidence; instead, it elicited Slagle's confession to selling drugs without even posing a permissible leading question. *See* JA 636 ("When you weren't working how did you get money?"). Slagle cannot complain that the question was irrelevant because the prosecution's question concerned Slagle's economic condition, which was undoubtedly relevant to whether he had a motive or the intent to commit aggravated burglary and robbery. Slagle's objection instead must rest with the answer that he gave.

Slagle next challenges the prosecution's inquiry on cross-examination as to whether Slagle had "ever [broken] into a house to get money[,]" JA 636, but such an inquiry was permissible under Ohio evidence law. The state supreme court held that the State's question was proper under Ohio Rule of Evidence 404(B) because it concerned a live issue at Slagle's trial: whether Slagle had the motive or intent to commit the crimes with which he was charged. *See Slagle*, 605 N.E.2d at 926. The only way this court could find that the prosecution acted improperly is by determining that the state supreme court misunderstood Ohio evidence law. Because we are "bound by the state court's determination of its own law[,]" the comment was not improper. *Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005).

The prosecution also did not act improperly by asking whether Slagle ever contributed to his family. *See* JA 638-39. Slagle's precise challenge on appeal to this inquiry is unclear. *See* Petitioner's Br. at 19. The inquiry arose from the prosecution's questions concerning how Slagle spent the money from his thefts and whether life was "one big party" to him. JA 638. The inquiry concerned Slagle's mental state during the time of his admitted thefts and was thus relevant to whether Slagle had a similar mental state during the burglary at issue.

The prosecution's inquiry into whether Slagle prayed and liked prayer was not improper. *See* JA 642-43. Lisa Bloxham, one of the children staying at Pope's house, testified that Slagle responded to Pope's prayer by saying, "Shut up because I don't like to hear your prayers." JA 414. The Supreme Court of Ohio stated in its opinion that Slagle had objected to the questions concerning his religious beliefs, but that court never directly addressed whether the inquiry was proper. *Slagle*, 605 N.E.2d at 925.

These questions were not improper despite their focus on religion because these questions concerned whether the statement concerning prayer was made, not Slagle's general truthfulness. Not all religious inquiries are forbidden. Ohio Rule of Evidence 610 states, "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced." Although this rule proscribes use of religion to impugn the "witness's propensity towards truthfulness[,]" *Redman v. Watch Tower Bible & Tract Soc. of Penn.*, 630 N.E.2d 676, 678 (Ohio 1994), Ohio law permits questions concerning religion to show bias and motive, *see Redman*, 630 N.E.2d at 677-78; *State v. Roper*, No. 94CA34, 1996 WL 140250, at *3 (Ohio Ct. App. Mar. 22, 1996). Whether Slagle prays or dislikes prayer is

at least slightly probative of whether he would tell someone to "shut up because I don't like to hear your prayers[,]" and, as with bias and motive, there is nothing in the Ohio rule that precludes the prosecution from asking questions concerning religion to determine the probability of a statement being made. The State did not suggest that Slagle's religious beliefs would cause him to testify untruthfully or, as in *Redman*, that Slagle's "religious beliefs were paramount to the oath taken prior to testifying." *Redman*, 630 N.E.2d at 678. The prosecution's inquiry was not improper.

More troubling is the prosecution's statement during its closing argument that Slagle "had the nerve to tell [the jury] 'I pray. I pray.'" JA 670. This statement is improper. Because the prosecution implied without any evidence that Slagle does not pray, the purpose of the comment appears to have been to inflame the passions of the jury.

Slagle also challenges the prosecution's question as to whether Slagle would have stabbed the police officer in the back if he had had the chance, JA 652, and whether Slagle "didn't want anyone to be able to tell the story of what you did that night[,]" JA 655. As the state court of appeals held, "The questions . . . were designed to elicit inculpatory answers on issues of material fact." *Slagle*, 605 N.E.2d at 926. The questions were relevant to whether Slagle had formed the intent to murder Pope, the children, or the officers that night. These questions were not improper. The prosecution, however, did act improperly by asking Slagle whether Slagle took the scissors from the bedroom after the murder so that he could "use them in [his] next—[,]" JA 656. This question was inflammatory and, because there was no issue concerning whether Slagle would kill again, did not concern an issue of material fact in this case.

Finally, the prosecutor asked Slagle whether he "was living the lie of [his] life when [he] tried to hide[.]" JA 652. This question, although perplexing, was not improper. Slagle asked the prosecutor to clarify what he meant, and the prosecutor answered that "your life is one big lie . . . ." JA 652. Slagle answered negatively. What the prosecutor meant is unclear, but he appears to have asked whether Slagle was attempting to escape responsibility for his crime. Contrary to Slagle's contention, the prosecutor was not stating any personal opinion. *See* Petitioner's Br. at 17. There is nothing improper about this puzzling inquiry. Thus, after considering all of the alleged character assaults, only the statements made during the closing argument of the guilt phase concerning whether Slagle prays and whether he would have used the scissors in another crime were improper.[1]

### 2.        *Facts Outside the Record*

Slagle next argues that the prosecution improperly argued facts outside the record and made speculative comments. Four statements were improper. The prosecution first asked Slagle, "Policemen don't scratch. Isn't that a fact?" JA 657. This statement is improper, as the trial court recognized by sustaining the defense's objection "as to whether that is or is not [a] fact." JA 657. The prosecution next argued that Pope's body revealed seventeen stab wounds, not three stab wounds as Slagle claimed. The prosecution stated that the coroner had told the prosecution outside of court that "the body doesn't lie." JA 69. This comment was improper because the prosecution was referring to an out-of-court statement of an expert witness to contradict Slagle's testimony.

Besides these two statements concerning facts outside the record, the prosecution also made two improper speculative comments. The prosecution stated, "[I]t's a damn good thing the kids didn't wake up[,]" JA 670, and "It is a good thing [Slagle] didn't know that Howard could identify

---

[1]Slagle also claims that he was prejudiced by the prosecution's attempt to explain felony murder by using an example of a bank robber who kills everyone in a bank. JA 697. Defense counsel successfully objected to this example and received a curative instruction. JA 697-98. This reference does not fit within the COA. The reference to the bank robbery did not impugn Slagle's character, act as a nonstatutory aggravating factor, introduce facts outside the record, denigrate the defense, or vouch for prosecution witnesses.

him," JA 672. Prosecutors may not express opinions having no basis in the record. *See United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). These speculative comments were thus also improper.

Three of the statements that Slagle challenges were not improper. First, the State's statement that the experts said that one gains tolerance to alcohol, JA 666, was proper because two of the experts, one for the prosecution and one for the defense, testified that tolerance develops when one has abused alcohol over a period of time. JA 608, 573. Second, the State's declaration that one can hear another walking in another room with floorboards because the floorboards will creak, JA 667, was proper because it relied only on common knowledge and concerned why Slagle removed his shoes when he entered Pope's residence. *See, e.g.*, *People v. Ackerman*, 669 N.W.2d 818, 828 (Mich. Ct. App. 2003) (per curiam) (prosecutors are permitted to draw reasonable inferences from the evidence in light of common experience). Finally, the prosecution's colloquial assertion that "Pope was ready to meet God," JA 670, was not improper because it was a reasonable inference from the evidence that Pope was praying and holding a rosary during her ordeal. Thus, four of the seven challenged statements were improper because they were not supported by facts outside the record or were speculative.

### 3.     *Referring to Nonstatutory Aggravating Factors*

Although Slagle next argues that the prosecution, by mentioning circumstances of the crime, deprived him of a fair trial by referring to nonstatutory aggravating factors, the circumstances of the crime were admissible during the sentencing phase to dispel the existence of any mitigating circumstances. The prosecution asked the jury to weigh the aggravating circumstances against the mitigating evidence, and the prosecution mentioned the circumstance of the crime. *See* JA 828, 829, 830, 832, 833, 834, 835-36, 836-37. The Supreme Court of Ohio held that "[a] prosecutor can legitimately refer to the facts and the nature and circumstances of the offense, to refute any suggestion they are mitigating or to demonstrate why aggravating circumstances outweigh mitigating factors." *Slagle*, 605 N.E.2d at 930. The state supreme court has consistently held this view. For instance, in *State v. Stumpf*, 512 N.E.2d 598 (Ohio 1987), the Supreme Court of Ohio held that

> [Ohio law] *requires* the jury, trial court, or three-judge panel to "*consider*, and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense* . . . ." In a particular case, the nature and circumstances of the offense may have a mitigating impact, or they may not. Either way, they must be considered. . . . [I]t would be illogical to require a three-judge panel to consider the nature and circumstances of the offense in making its decisions whether the aggravating circumstances were sufficient to outweigh the mitigating factors, yet to forbid that panel from relying upon and citing such nature and circumstances as reasons for its decision.

*Id.* at 604 (citations omitted). And in *State v. Gumm*, 653 N.E.2d 253, 262 (Ohio 1995), the Supreme Court of Ohio held that "the fact that a particular murder was, for instance, particularly cruel or heinous is relevant to the determination of the appropriateness of actually imposing a death sentence on a death-eligible perpetrator, even though the fact of cruelty or heinousness would not, of itself, be sufficient to bring the crime within the scope of any section of [Ohio Revised Code] 2929.04(A), nor could that fact be used to cause the defendant to become death-eligible."

The state court's holding that the prosecution did not violate Ohio law is entirely consistent with the applicable Ohio death-penalty statutes. Ohio law provides specific criteria for imposing a sentence of death. *See* Ohio Rev. Code § 2929.04. Eight possible circumstances are defined as aggravating circumstances or death-penalty specifications, and Slagle was convicted of two

specifications under § 2929.04(A)(7) (offense committed during aggravated robbery and offense committed during aggravated burglary).  If one of these circumstance is proved, then the jury "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following" mitigating factors:

> (1) Whether the victim of the offense induced or facilitated it;

> (2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

> (3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

> (4) The youth of the offender;

> (5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

> (6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

> (7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

§ 2929.04(B).  "If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender."  Ohio Rev. Code § 2929.03 (D)(2).  There is no reason to believe in this case that the jury did not follow the statute's command.  Although the prosecutor mentioned the word "aggravating" while recounting some of the circumstances of the crime, the trial court gave extremely clear instructions to the jury that identified the two aggravating circumstances that were relevant to Slagle's case and that stated that the circumstances of the crime that were relevant to mitigation. *See* Trial Tr. at 2159-62.  The comments, under Ohio law, were not improper.[2]

Moreover, "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the [Federal] Constitution."  *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir.

---

[2]Slagle also argues that the prosecution misstated the law when he referred to Slagle's age at the time of trial, as opposed to his age at the time of the crime.  *See* Petitioner's Br. at 39.  This argument is not well-taken.  The prosecution's point was that the circumstances of the aggravated crime outweighed the mitigating effect, under Ohio Revised Code § 2929.04(B)(4), of Slagle's youth.  *See* JA 827.  The prosecution impliedly conceded that a nineteen- or twenty-year-old murderer benefits from the mitigating factor regarding youth.  He was not misstating the law or misleading the jury.

Slagle's next argument is that the prosecution should not have argued that Slagle was attempting to escape detection because the State, when seeking the death penalty for Slagle, did not rely on the statutory aggravating factor concerning those who kill to escape detection.  This argument is also meritless.  The prosecution referred to Slagle's motive to prevent detection as a way of demonstrating that he had intent to commit murder.  *See* JA 667, 670, 675-76.  The prosecution did not rely upon this ground during the sentencing phase as a ground on which to impose the death penalty.

2003) (citing *Barclay v. Florida*, 463 U.S. 939, 956-58 (1983)).**3**   This point is particularly compelling in this case, where the Ohio trial court, the Court of Appeals of Ohio, and the Supreme Court of Ohio complied with the mandates of the Ohio Revised Code §§ 2929.03(D)(3) and 2929.05(A) to "review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances that the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate."   All three courts found that the aggravating circumstances outweighed the mitigating circumstances.  *See* JA 859 ("[T]he Court . . . has found by proof beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors in this case."); *State v. Slagle*, No. 55759, 1990 WL 82138, at \*19-20 (Ohio Ct. App. June 14, 1990); *State v. Slagle*, 605 N.E.2d 916, 930-31 (Ohio 1992).  "[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990).  Any error arising from the prosecutorial reference to nonstatutory aggravating factors in this case, therefore, was devoid of constitutional import.

As a related matter, Slagle also argues that the prosecution impermissibly caused the jury to consider whether other people would be affected by divorce in the way that Slagle was. JA 838.  But the prosecution does not have to allow Slagle to offer his mitigation evidence unchallenged.  There is nothing unreasonable about allowing the prosecution to argue that, because most people from divorced homes do not murder, the divorce of Slagle's parents did not affect Slagle to the extent that he claimed.  Although Slagle contends that *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion), and *Woodson v. North Carolina*, 428 U.S. 280, 303-304 (1976) (plurality opinion), prohibit the jury from considering the effect of divorce on others, these cases say only that individualized character evaluations are required.  The prosecution in this case did not ask the jury to ignore Slagle's reaction to his parents' divorce.  Instead, the prosecution asked the jurors to consider the truth of Slagle's alleged reaction in light of their common experiences.  The prosecution's reference to the effect of divorce on others was not improper.

### 4.     *Denigrating Defense Witnesses and Counsel*

Slagle next argues that his trial was rendered unfair by prosecutorial statements that allegedly denigrated defense witnesses and counsel.  Five of the six challenged statements were improper or at least of questionable propriety.  First, the prosecution's comment that defense counsel was in a "mad scramble at this point to salvage [Slagle's] credibility" was not improper. JA 691.  The prosecution appropriately attacked Slagle's credibility after his testimony was less complete than his pretrial statements and after his attorneys had him stipulate to aggravated burglary. *See* JA 691.  The State was permitted to comment on the defense's trial strategy. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) ("Case law permits comments that are made in response to the argument and strategy of defense counsel.") (internal quotation marks omitted).

Five of the statements, however, were improper or at least of questionable propriety.  One statement impugns Slagle's counsel: "[Defense counsel] posed many of his questions with 'Do you remember that, Billy?'. . . He was keyed in to not remember," JA 688.  Another statement characterizes Billy in an inflammatory manner: "Billy Slagle and his kind today represent some of

---

**3**We note that nothing in *Brown v. Sanders*, __ U.S. __, 126 S. Ct. 884 (2006), is to the contrary. *Brown* concerned the effect on a defendant's sentence when an eligibility factor for the death penalty is subsequently invalidated.  The Supreme Court decided no longer to distinguish between so-called weighing and nonweighing states when an eligibility factor has been held to be invalid. *See Brown*, __ U.S. __, 126 S. Ct. at 892.  Instead, the Supreme Court propounded a uniform rule. *See id.*  In this case, there is no issue concerning an eligibility factor that has later been held invalid, and thus the *Brown* case does not affect our analysis.

the greatest threats against community and civilization as we know it," JA 702. Three of the statements belittle defense witnesses: the prosecution's characterization of Slagle's expert evidence concerning the effects of intoxication from Dr. Bertschinger as "liberal quack theories . . . ." JA 700; the prosecution's statement that witness Mike Davis was high, JA 664, and "crawled out of a hole," JA 693; and that the defense experts were "trying to promote a bit of sympathy for Slagle," JA 682. All of these witnesses testified to Slagle's voluntary intoxication—the main issue at trial and a permissible way for Slagle to demonstrate that he lacked the specific intent to commit murder. *See State v. Fox*, 428 N.E.2d 410, 411-12 (Ohio 1981). Although the prosecution was free to challenge the factual assertions that Davis and the experts made as to Slagle's level of intoxication or his alleged alcohol dependency, the prosecution was not permitted to make "know-nothing appeals to ignorance" in this case. *Gall v. Parker*, 231 F.3d 265, 314 (6th Cir. 2000). Thus, for purposes of this appeal, we consider five of the statements denigrating the defense to have been improper.

### 5.        *Vouching for Prosecution Witnesses*

The prosecution also made several improper comments when vouching for prosecution witnesses. The prosecution stated in its closing argument during the guilt phase, "I put my money on the homicide detectives," JA 692, "I do very much stand behind the police work," JA 701, "I put our trust in Patrolmen Chappelle and Finchum and Guido," JA 701, and "Howard Bloxham is not going to come in here and tell you something that is not true," JA 671. These comments were all clearly improper because the prosecutor "must refrain from interjecting personal beliefs into the presentation of [the] case." *United States v. Young*, 470 U.S. 1, 8-9 (1985); *see also Bates v. Bell*, 402 F.3d 635, 644 (6th Cir. 2005). The police officers' testimony was relevant to Slagle's mental state at the time of the crime because they testified to his appearance and lucidity at the scene and during his interview immediately after the murder. With these four improper vouching statements, the total number of improper statements is fifteen.[4]

### B.        *Other Factors*

The most difficult question in this case is whether the prosecution's fifteen improper comments amounted, in the aggregate, to prosecutorial misconduct that rendered Slagle's trial fundamentally unfair. These fifteen improper comments taken together did not render Slagle's trial unfair. We reach this conclusion by applying the four factors set out in *Carter*. *See* 236 F.3d at 783. First, the case against Slagle was strong. Second, the improper statements were only minimally prejudicial. Third, the improper statements were relatively isolated. Finally, the improper comments do not appear intentional.

### 1.        *Strength of the Case Against Slagle*

The evidence against Slagle in this case was strong. The only issue in this case was whether Slagle had sufficient lucidity, after drinking alcohol and smoking marijuana, to form the requisite intent to commit aggravated murder. That Slagle conceded that he had the intent to commit aggravated burglary and robbery, *see, e.g.*, JA 646, supports the jury's finding that he could form

---

[4] The improper comments include: (1) asking on cross-examination whether Slagle planned to use scissors in his next murder, (2) telling the jury that Slagle had the nerve to say that he prayed, (3) asking whether it is fact that policemen do not scratch, (4) relaying the out-of-court statement that the body does not lie, (5) speculating as to what would have happened if the children had woken up, (6) speculating as to what would have happened if Slagle knew that Howard could identify him, (7) implying that defense counsel coached Slagle not to remember the murder, (8) referring to Slagle as one of the greatest threats against civilization, (9) characterizing the expert testimony of Slagle's expert witness as liberal quack theories, (10) asserting that the purpose of his witnesses' testimony was to gain the jury's sympathy, (11) describing defense witness Mike Davis as having crawled out of a hole and high at the time of trial, and (12-15) vouching four times for prosecution witnesses.

the intent to kill. The record also reveals that alcoholics become tolerant of alcohol, *see* JA 608, 573; that Slagle had been drinking heavily since he was fifteen, *see* JA 865; that he was able to ride a bicycle two miles to Pope's house, JA 625, without having any trouble, JA 563; that he had the presence of mind to remove his shoes when he broke in; that he thought to hide in a closet when the police came to the house; that he was alert and responsive to investigators' questions, JA 473; that he was able to provide his social security number and date of birth to officers on the scene, JA 472; that he was able to provide the address and name of Mike Davis, JA 472; that he did not smell of alcohol, JA 475; and that he was quick and agile when the police tried to subdue him at the crime scene, JA 436. The jury had more than enough evidence to find that Slagle had the ability to and did form the intent to kill.

Slagle's most compelling evidence that he was too intoxicated to form the requisite intent was his failure to remember the events. But even this evidence was not convincing because his statements to investigators differed from his testimony at trial. He told the investigators that he entered into the basement, where he took off his shoes, looking for something to steal. JA 464. He then went to the room where the children were sleeping. JA 464. He then told the investigators that he was attempting to steal something in Pope's bedroom when she woke up and screamed. He said that he put his hands over her mouth, and they began fighting for her sewing scissors. He thought that he stabbed her three times. JA 464. Slagle also said that he had attempted to rape Pope but that he was unable to get an erection. JA 468. At trial, however, his testimony was contrary to some of his statements to investigators. He testified that he did not remember walking into the basement, JA 626, and he remembered only stabbing her once, JA 628. He also testified that he remembered neither trying to rape her nor telling the investigators that he had attempted to do so. JA 642. Even during his cross-examination, his story changed. When asked what he said to Pope when she began to pray, he stated, "I don't remember saying nothing to her." JA 642. But when the prosecution asked him if he told her to shut up, he stated, "I don't remember saying that much." JA 642. The inconsistencies in Slagle's testimony provide an additional basis, in addition to the numerous facts already recounted, for the jury to find beyond a reasonable doubt that Slagle formed the intent to kill on the night of the murder.

### 2.      *Prejudice*

A full consideration of the improper statements demonstrates not only that they were minimally prejudicial in the context of Slagle's trial but also that they are not similar in degree to the improper statements in other cases that we have held, on habeas review, rendered trials fundamentally unfair. Thus, the second *Carter* factor does not support granting Slagle's petition.

Of the fifteen improper statements or questions at issue, Slagle's counsel helped to mitigate the prejudice by successfully objecting to nine of the comments. Defense counsel objected to both improper questions posed on cross examination, concerning whether it is a fact that policemen scratch and whether Slagle would have used the scissors in another crime. Defense counsel also objected to the following statements during the closing argument at the guilt phase: that the body does not lie, that Slagle would have killed Howard if Slagle had known that Howard could identify him, that defense counsel cued Slagle not to remember, that Mike Webb was high, that Slagle was the greatest threat to civilization, that the defense witnesses' purpose was to gain the jury's sympathy, and that Dr. Bertschinger relied on "liberal quack theories." The last four objections, as well as the two objections to questions posed on cross, concerned four of the most prejudicial comments, and all of these objections led to curative instructions from the trial court. These objections and instructions mitigated much of the prejudice to Slagle.

Even had there been no defense objections, many of these statements were only minimally prejudicial. First, the statement that the body does not lie was improper because the prosecution stated that an expert witness had made the statement outside of court. But if counsel had phrased

the statement as one of his own to contradict Slagle's assertion that he had stabbed Pope only three times, the comment would not have been improper. The prosecution was merely pointing out that the physical evidence contradicted Slagle's testimony.

Second, the comment that witness Mike Davis was high and crawled out of hole was only minimally prejudicial considering that Davis had admitted to smoking marijuana and drinking. Furthermore, Slagle argued that it was his lowlife friends that were part of his downfall. *See* JA 792 (defense expert witness Dr. Bertschinger testifying that Slagle, after being a successful student without behavior problems in high school, turned to drugs to fit into his social peer group), 865 (Dr. Isidore Helfand's 1986 psychological evaluation of Slagle for the Ohio juvenile court), 867 (Slagle's mother told Glenbeigh Hospital that her son was part of a "bad crowd").

Third, the question as to whether it was a fact that policemen do not scratch can hardly be deemed prejudicial because the error rested in the form of the question. The prosecutor, following the improperly formed question, rephrased his question without objection by asking, "Is it not a fact that . . . Pope [as opposed to a police officer] scratched you and gouged you as she fought for her life?" JA 657. The error was, at most, only minimally prejudicial to Slagle.

Fourth, the speculative comments concerning what would have happened if the children had woken up or if Slagle had known that Howard could identify him were also not highly prejudicial. These comments were made during the guilt phase of the trial in narrative form and were close to inferences from the facts at the trial. Because Detective John McKibben testified that Slagle told him that "everything just got out of hand" when Pope woke up, JA 467, and because Slagle testified that he had gone into the children's bedrooms, JA 618-19, there is at least some support in the record for an inference that others would have been in danger had Slagle noticed their conscious presence.

Finally, the improper comments in this case are not nearly as egregious as those in other cases in which this court has reversed a state court's application of federal law regarding prosecutorial misconduct. In *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005), this court reversed the petitioner's death sentence because of egregious prosecutorial misconduct during the sentencing hearing. The prosecutor in that case repeatedly stated that the jurors would "[vote] for death for someone else" if they did not vote to condemn the defendant to death. *Bell*, 402 F.3d at 642. The prosecutor then repeatedly vouched for prosecution witnesses and denigrated defense witnesses who testified at the mitigation hearing by saying, for example, that "I don't care what [the prosecution's expert witness] Marshall says. I don't really care what [defense mitigation expert witness] Griffin says. I don't care at all what [defense counsel] Mr. Peters or really, what [defense counsel] Mr. Bean says because I believe this to be true, and I believe you share the same belief." *Id.* at 645. The prosecutor also repeatedly criticized the defense for objecting. *See id.* at 646.

First, in contrast to *Bates*, the prosecution in this case did not make nearly as many or such egregious improper comments, and it did not make any such comments during the penalty phase. Second, the prosecution did not repeatedly tell the jurors that they would cause another to be murdered if they refused to sentence Slagle to death. Although the prosecution once improperly stated at closing that Slagle was a great threat to the community and once implied on cross examination that Slagle would have committed future crimes with the scissors had he not been caught, the trial court in Slagle's case sustained defense counsel's objections and told the jury to disregard both comments. Third, the prosecution also did not make any improper comments regarding mitigation experts, or regarding any other topic, during the sentencing hearing. The prosecution's improper comments that a defense expert witness relied on "liberal quack theories" and that the other experts' purpose was to create sympathy for Slagle were only made once each, during the guilt phase of trial, and the trial court gave a curative instruction both times. Slagle has offered no reason why these improper comments could not be cured with the trial court's instruction, especially considering that the comments were made weeks before sentencing. Fourth, the vouching

comments in this case were not nearly as egregious as those in *Bates*. The prosecution in Slagle's case never told the jurors what they believed or implied that reaching a belief in the absence of evidence from either party was sufficient to return a death sentence. Finally, unlike in *Bates*, no comments denigrated the defense for objecting. Overall, the content and timing of the improper comments in this case were not as prejudicial as those during the penalty phase in *Bates.*

The comments in Slagle's case are also not nearly as egregious as those in *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2002), to which Slagle refers in his brief. In *DePew*, the prosecutor made several improper comments during the sentencing phase of trial. First, the prosecutor, in violation of the Fifth and Fourteenth Amendments, commented on the defendant's refusal to testify at the sentencing hearing. *See id.* at 750. Second, the prosecutor commented on a knife fight in which the defendant had been involved. This comment had no basis in fact because the defendant had actually been attacked. Moreover, this comment was especially prejudicial considering that the fight was the same kind of incident for which the defendant was facing the death penalty, and that the defendant's only ground for mitigation was that he had always been a law-abiding person. *See id.* at 749. Third, the prosecution told the jury that any sentence less than death could result in parole. *See id.* at 747.

In contrast, again no improper comments were made in Slagle's case during the sentencing phase of trial, and Slagle has not challenged any prosecutorial conduct as violating an independent constitutional ground. *See Donnelly*, 416 U.S. at 643 (distinguishing, in a prosecutorial misconduct case, cases "in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights"). The prosecution's statements of facts outside the record in this case were much less inflammatory than in *DePew*. The comments in this case concerned whether policemen scratch, whether the body does not lie, and speculative comments concerning the crime in question. The facts outside of the record in *DePew*, however, were misleading and concerned events that were not relevant to the crime at issue. Finally, there is no evidence in this case that the prosecution told the jury that a sentence of death was the only way to prevent Slagle from being paroled. The improper comments made during the guilt phase of trial in Slagle's case were not only almost all minimally prejudicial, but the comments were also not nearly as prejudicial as the comments made in the penalty phases in the two cases on which he relies.

### 3.          *Isolated or Extensive Comments*

All of the comments were isolated, and none were repeated after an objection. Thus, the third *Carter* factor does not support granting Slagle's petition. All of the minimally prejudicial comments mentioned in the immediately preceding discussion were mentioned only once, and the comments with more than minimal prejudicial harm were also made only once. For instance, the comment that Slagle had a lot of nerve to testify that he prayed was prejudicial because its only purpose appears to be to inflame the passions of the jury against a potentially nonreligious person. But this comment was also made only once, during the guilt phase of trial as the prosecution narrated the facts presented at trial. Only the vouching comments are arguably extensive, but even of these, there were only four such comments, one sentence each, in the closing argument that consumes over 100 pages of trial transcript. Unlike the prosecution in *Bates*, the prosecution here did not repeat certain tag lines or commit the same error after an objection. *See Bates*, 402 F.3d at 648. The fifteen comments were not extensive during this trial that comprises over 1000 pages of trial transcript, and therefore the prosecution's misconduct was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotation marks and citations omitted).

### 4. *Accidental or Intentional Comments*

Finally, the prosecution's comments in this case do not appear intentional because the prosecution did not repeat its improper comments. Therefore, the fourth *Carter* factor does not support granting Slagle's petition. Unlike in *Bates*, the prosecution in this case did not use improper argument "repeatedly during summation." *Bates*, 402 F.3d at 648. The prosecution also did not continue his improper conduct after successful defense objections. *See id.* The vouching comments were the only comments that are arguably extensive, but the prosecution may well not have realized its improper comments in the heat of argument because there was no defense objection. Moreover, the improper statements in this case do not reveal a covert strategic use, repeated for the sake of emphasis. The prosecution did not repeat any of the improper comments during the sentencing phase of trial. *See id.* The prosecution does not appear, therefore, to have intentionally made improper comments during Slagle's trial.

### C. *Conclusions from the Application of the Two-Prong Test*

Analysis of the four *Carter* factors demonstrates that Slagle's trial was not rendered fundamentally unfair at either the guilt or sentencing phase. "Overwhelming evidence of guilt can oftentimes be sufficient to sustain a conviction despite some prosecutorial misconduct." *Bates*, 398 F.3d at 648-49; *see also Darden*, 477 U.S. at 182 ("[T]he overwhelming . . . evidence to support a finding of guilt on all charges . . . reduced the likelihood that the jury's decision was influenced by argument." (citations and quotations omitted)). There can be no question in this case that the evidence of Slagle's guilt was overwhelming. As our earlier consideration of the evidence shows, the jury had extensive evidence from which to find Slagle had the ability to form the intent to commit aggravated murder. In this case, despite the presence of prosecutorial misconduct during the guilt phase of the trial, it was not unreasonable for the Ohio courts to hold that the jury was not influenced by the prosecution's improper comments in finding Slagle guilty of murder.

Furthermore, the improper comments during the guilt phase did not taint the sentencing phase of the trial because all of the improper comments were only minimally prejudicial. Considering that the prosecution made no improper comments during the sentencing phase of trial in which Slagle produced mitigation evidence, *see Darden*, 477 U.S. at 183 n.15 ("In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing."), and that only a few of the comments could even arguably directly relate to the matters at sentencing, the prosecution's improper comments during the guilt phase of trial did not "'constrain the manner in which the jury was able to give effect' to mitigating evidence" in violation of the Eighth Amendment. *DePew*, 311 F.3d at 748 (quoting *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998)). Moreover, any confusion was cured in ample ways. The trial court gave proper, clear instructions regarding sentencing. *See, e.g.*, Trial Tr. 2159-62. The defense made the first and last closing arguments at the sentencing hearing. *See, e.g.*, JA 820, 840. The defense made numerous objections at the guilt phase and received curative instructions. The defense also had the opportunity to call the same experts during the sentencing phase to offer mitigation evidence. Finally, and perhaps most importantly, there was an approximately three-week delay between the guilt and penalty phases of the trial. Any cumulative effect of the improper comments was minimal during the sentencing phase of Slagle's trial and therefore provides no basis for holding that Slagle's trial was rendered fundamentally unfair.

As the foregoing discussion demonstrates, an analysis of the pertinent factors for prosecutorial misconduct demonstrates that the Supreme Court of Ohio did not unreasonably apply federal law in determining that the prosecution's improper statements did not render Slagle's trial fundamentally unfair in violation of the Federal Constitution.

**V.**

Slagle's claims of ineffective assistance of counsel fail because Slagle cannot demonstrate that defense counsel's allegedly unreasonable representation prejudiced him. Slagle claims that defense counsel, both at trial and on appeal, failed to object to the prosecutor's improper comments and use of nonstatutory aggravating factors. The Ohio courts correctly relied on *Strickland v. Washington*, 466 U.S. 668 (1984), in considering Slagle's claims for ineffective assistance of counsel. *See Slagle*, 605 N.E.2d at 928; *Slagle*, 1990 WL 82138, at *16. Constitutionally ineffective assistance of counsel requires both that defense counsel's services fell below that of a reasonably competent attorney and that the deficiency prejudiced the defendant. *Strickland*, 466 U.S. at 687. We have examined the comments to which no objections at trial or challenges on appeal were made and determined that the Ohio courts have not unreasonably applied federal law in holding that Slagle's trial was not rendered fundamentally unfair. We have also determined that the prosecution's alleged use of nonstatutory factors was not improper and, even if it were, was not unconstitutional. Because the failure to object to these actual and alleged improper statements did not prejudice Slagle, his ineffective-assistance-of-counsel claims fail.

**VI.**

Finally, we deny as untimely Slagle's request that we extend his COA to include additional issues. Slagle's argument that this court erred in denying his request for an extended COA is tantamount to petitioning this court for a rehearing on his COA application. But, by failing to file his petition for rehearing within fourteen days of this court's January 7, 2005, order denying his application, Slagle failed to satisfy the requirements of Federal Rule of Appellate Procedure 40(a)(1). Slagle offers no excuse for the delay, and therefore we deny his request.

**VII.**

For the foregoing reasons, we AFFIRM the judgment of the district court and deny Slagle's untimely request to extend his COA.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  Because I believe that the prosecutorial misconduct during the guilt-phase of Billy Slagle's trial so infected the trial that the misconduct violated Slagle's due process rights, I respectfully dissent.  I believe the Supreme Court of Ohio's conclusion that Slagle received a fair trial despite the prosecutorial misconduct constituted an unreasonable application of clearly established Supreme Court precedent, specifically the legal principles in *United States v. Young*, 470 U.S. 1 (1985), *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Berger v. United States*, 295 U.S. 78 (1935).

## I. THE PROSECUTOR REPEATEDLY MADE IMPROPER STATEMENTS

I share the majority's view that the fifteen prosecutorial statements that it concludes were improper were in fact improper.  The trial transcript is rich with evidence that the prosecutor consistently pushed the envelope throughout Slagle's trial, and repeatedly overreached the bounds of proper prosecutorial conduct when questioning witnesses and presenting closing arguments.  The improper prosecutorial comments included attacks on Slagle's character and denigrations of Slagle's attorneys and witnesses.  In addition, the prosecutor made assertions of facts outside the trial record and vouched for prosecution witnesses.  The pervasiveness of these improper prosecutorial statements — both in number and in subject matter — renders them worth repeating.  I concur with the majority that it was improper for the prosecutor to:

(1)     state during closing arguments that Slagle had the nerve to tell the jury that he prayed, Joint Appendix ("J.A.") at 670 (Trial Tr. at 1810);

(2)     insinuate that Slagle took the scissors from the scene so that he could use them in his next crime, J.A. at 656 (Trial Tr. at 1767);

(3)     state that Slagle "and his kind . . . represent some of the greatest threats against community and civilization as we know it," J.A. at 702 (Trial Tr. at 1923);

(4)     impugn Slagle's counsel by suggesting that Slagle "was keyed in not to remember," J.A. at 688 (Trial Tr. at 1841);

(5)     impugn Slagle's expert witness Dr. Bertschinger, who testified about the effects of intoxication, by characterizing Bertschinger's testimony as "liberal quack theories . . . of how you should excuse a person's behavior," J.A. at 700 (Trial Tr. at 1918);

(6)     impugn Slagle's lay witness Mike Davis by asserting that he was high when he testified, J.A. at 664 (Trial Tr. at 1798), and that he had "crawled out of a hole," J.A. at 693 (Trial Tr. at 1906);

(7)     state that Slagle's expert witnesses were "trying to promote a bit of sympathy for Slagle," J.A. at 682 (Trial Tr. at 1833);

(8)     assert "Policemen don't scratch.  Isn't that a fact?"  J.A. at 657 (Trial Tr. at 1768);

(9)     state that the coroner had told the prosecution out of court that "the body doesn't lie," J.A. at 693 (Trial Tr. at 1906);

(10)    insinuate that Slagle would have harmed the children sleeping upstairs at the time of the killing by stating that "[I]t's a damn good thing the kids didn't wake up.  God forbid."  J.A. at 670 (Trial Tr. at 1810);

(11)    again insinuate that Slagle would have harmed the children by stating "It is a good thing [Slagle] didn't know that Howard [Bloxham] could identify him," J.A. at 672 (Trial Tr. at 1813);

(12)    vouch for the police work in this case during closing argument by stating, "I put my money on the homicide detectives," J.A. at 692 (Trial Tr. at 1905);

(13)    vouch for the police work by stating, "I do very much stand behind the police work," J.A. at 701 (Trial Tr. at 1920);

(14)    vouch for the police work by stating, "I put our trust in Patrolmen Chappelle and Finchum and Guido," *Id.*;

(15)    vouch for a prosecution witness by stating, "Howard Bloxham is not going to come in here and tell you something that is not true," J.A. at 671 (Trial Tr. at 1812).

Beyond our agreement that all fifteen of these statements were clearly improper prosecutorial statements, my analysis of Slagle's prosecutorial misconduct claim departs from the majority's in several crucial ways, necessitating my dissent.

First, I believe several additional prosecutorial statements were improper. To begin, I emphatically disagree with the majority that the prosecutor's interrogation of whether Slagle engaged in prayer and liked prayer was proper. "A person's beliefs, superstitions, or affiliation with a religious group is properly admissible *where probative of an issue in a criminal prosecution*." *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996) (emphasis added). I struggle to comprehend how the majority can believe that these questions were probative to any issue in Slagle's prosecution. The majority's assertion that the prosecutor's questions about Slagle's relationship with prayer "concerned whether [the victim's] statement concerning prayer was made" is simply not supported by the record, because these improper statements were made after those questions were asked and answered.

Based upon the previous testimony of the Bloxham children that Pope had prayed during Slagle's attack and that in response, Slagle had told her to "shut up" and that he didn't want to hear her prayers, J.A. at 414 (Trial Tr. at 1222), J.A. at 424 (Trial Tr. at 1239), it was not improper for the prosecutor to ask Slagle if those events occurred. The record clearly indicates, however, that the prosecutor persisted with this prayer-themed line of questioning after asking Slagle if the above statements were made, and after Slagle testified that he did not remember whether Pope prayed or what he said to her in response to her praying. J.A. at 642 (Trial Tr. at 1753). The prosecutor continued to question Slagle on this prayer theme, turning away from the events of Pope's killing and generally questioning Slagle, who is a Native American, J.A. at 583 (Trial Tr. at 1692), about his habits and feelings regarding prayer. The prosecutor suggested, "You don't like prayers, do you, Billy?" Slagle responded, "There is nothing wrong with them." The prosecutor responded with, "You don't say them; right?", to which Slagle responded in the affirmative. Slagle's attorneys did not object, but the judge requested that Slagle clarify his answer and Slagle responded, "I say them[,]" and "I have always said them." J.A. at 642-43 (Trial Tr. at 1753-54). Unwilling yet to abandon his prayer-themed questions, the prosecutor embarked on another line of questioning, asserting to Slagle "[y]ou sure weren't saying [your prayers] when you were up to your neck . . . in beer and marijuana" or when "you were drinking your beer on the afternoon" before he killed Pope. *Id.* at 643.

All of the prosecutor's prayer-themed questions and religious references subsequent to Slagle's statement that he did not remember Pope praying or his response to that were improper. The probative nature of this line of questioning stopped there. Slagle's own religious beliefs and practices "had no bearing whatsoever on any legitimate issue in the case. Whether or not [these] statement[s] [were] prejudicial, [they] clearly invited the jury to consider religion as somehow relevant. Prosecutorial zeal cannot excuse such grave misconduct." *United States v. Goldman*, 563 F.2d 501, 504-05 (1st Cir. 1977). "Injection of religion into the case was flatly wrong and contrary to what the public has a right to expect of government prosecutors." *United States v. Cartagena-Carrasquillo*, 70 F.3d 706, 713 (1st Cir. 1995).

In addition to this improper religiously oriented interrogation of Slagle, it was also improper for the prosecutor to state during closing argument that Slagle lacked a conscience. In an apparent attempt to rebut Slagle's theory that the alcohol and marijuana that he had ingested that day had diminished his culpability, the prosecutor asserted, "Billy Slagle didn't need a conscience eliminator. You can't eliminate what is not there. He has no conscience." J.A. at 685 (Trial Tr. at 1836).

Similarly, during Slagle's cross examination, the prosecutor repeatedly used the phrase "the lie of your life," J.A. at 644-45, 652 (Trial Tr. at 1755-56, 1763). The third time the prosecutor used that phrase, Slagle asked what he meant by it, and the prosecutor responded with "Your life has been one big lie, right?" J.A. at 652 (Trial Tr. at 1763). Slagle's counsel did not object.

The prosecutor's statements that Slagle "has no conscience" and that his whole "life has been one big lie" were highly improper. The statements were not specific questions or references to any inconsistencies in Slagle's testimony, but rather they were blanket assertions that Slagle was a terrible person who could not be trusted. These character assaults on Slagle were improper because they represented the prosecutor's personal beliefs, which may not be introduced into the trial. *See United States v. Young*, 470 U.S. at 8-9 ("Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case."). Given that Slagle decided to testify, "it was not improper for the prosecutor to question his credibility. The impropriety stems from the manner in which [he] did so. The prosecutor's attacks were not expressly based on evidence before the jury." *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999). "These utterances of personal sentiment placed in front of the jury with no explanation or indication of evidentiary bases were improper." *Id*.

## II. THE PROSECUTOR'S IMPROPER COMMENTS WERE FLAGRANT

I am bewildered and dismayed by the majority's conclusion that Slagle received a fair trial despite these widespread and diverse prosecutorial attacks on him and his defense, as well as the improper vouching for the state's witnesses. The majority's claim that "almost all" of the improper comments were "minimally prejudicial" is incredible. (Majority Op. at 18). After considering the four factors relevant to determining flagrancy — whether the improper comments "tended to mislead the jury or prejudice the defendant," whether the improper comments "were isolated or extensive," "whether the remarks were deliberately or accidentally made," and the strength of the evidence of Slagle's guilt — I am persuaded that these improper statements were flagrant, and did not constitute harmless error. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 126 S. Ct. 163 (2005). Instead, I believe that the prosecutor's repeated attacks on Slagle and his defense case, as well as the improper bolstering of the state's case, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 643.

Many of the prosecutor's improper assaults and references were likely to mislead the jury or prejudice the defendant. The vouching statements and assertions of facts outside the record present at least two dangers: (1) "the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"; and (2) "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19. "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88.

While the prosecutor's vouching and bolstering comments were prejudicial, the most vile of the prosecutor's statements were the attacks on Slagle's religious practices made during Slagle's

cross examination and the state's closing argument. That the prosecutor utilized a religiously oriented narrative throughout Slagle's trial increased the prejudicial nature of these attacks on Slagle's religious beliefs. A review of the record reveals a prosecutorial theme whereby the prosecutor repeatedly described Mari Anne Pope as a devout Christian, and portrayed Billy Slagle as a nonbeliever or a believer of dubious faith.[1] The prosecutor returned to this theme in his closing argument, chiding Slagle for stating on cross examination that he prayed.

Whether either of these narratives about the religious beliefs and habits of Pope and Slagle is factually correct is utterly irrelevant to the central issue at the heart of Slagle's trial — whether Slagle's voluntary intoxication from alcohol and marijuana prevented Slagle from having the requisite intent for aggravated murder when he killed Mari Anne Pope. Despite the irrelevance of the victim's and Slagle's religious practices to this ultimate issue at trial, the prosecutor persistently pursued this theme in his attempt to portray Slagle as nonreligious and hostile to religion. While not probative to any material issues, these religiously oriented statements were highly prejudicial. These religiously oriented attacks on Slagle were brazen appeals to the jury's religious predilections or biases and likely to inflame the jury. *See United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir. 1970) (stating that appeals to prejudices are "foul blows" not tolerated by the United States courts and applying *Berger*); *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) (stating that appeal to a jury's racial and religious prejudices "prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require."); *Bains v. Cambra*, 204 F.3d 964, 974 n.5 (9th Cir. 2000) (stating that, "although perhaps to a lesser extent" than racial or ethnic-based arguments, "religion-based prosecutorial arguments also are prohibited under clearly established federal law"); *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000) ("Appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial.").

The improper prosecutorial statements in Slagle's trial were also extensive, in terms of the number of improper statements as well as in the breadth of improper references. "[T]he improper conduct was not isolated to one comment," or "one section of the argument." *Bates,* 402 F.3d at 648. The prosecutor improperly attacked Slagle and his intoxication defense from every possible angle. The nature of the improper statements and the transparency of the prosecutor's strategies evidence that the statements were made deliberately. *Id.* (stating that the "intentionality of the prosecutor's improper remarks can be inferred from their strategic use"). These statements were not "off-hand remark[s] in a heated trial," but rather the prosecution "opted to select inappropriate arguments and use them repeatedly," both when questioning witnesses and during closing arguments. *Id.*

Finally, I do not share the majority's belief that there was overwhelming evidence that Slagle was sober enough when he killed Pope that he possessed the necessary intent to commit aggravated murder. From my review of the record, I believe that this was a much closer question than the majority presents. The defense presented undisputed testimony that "Slagle had at least 12 and probably more beers, that he had 4 or 5 shots of bourbon, and that he was smoking marijuana in the 12 hour period that immediately preceded the crime." J.A. at 589 (Trial Tr. at 1698). The detectives

---

[1] *See* J.A. at 349 (Trial Tr. at 1040) (stating during opening statements that Pope "was a deeply religious woman"); J.A. at 377 (Trial Tr. at 1151) (questioning Pope's cousin in detail about Pope's rosary); J.A. 386-87 (Trial Tr. at 1160-61) (eliciting testimony from Pope's cousin about witnessing Pope wearing her scapular); J.A. at 403 (Trial Tr. at 1190) (eliciting testimony about "the broken rosary, the torn chain, the torn scapular" at the crime scene); J.A. at 641 (Trial Tr. at 1752) (accusing Slagle of tearing up Pope's rosary and throwing it on the floor, asking Slagle if he knows what a rosary is, and asking Slagle if he is a Catholic); J.A. at 642 (Trial Tr. at 1753) (accusing Slagle for a second time of destroying Pope's rosary during the assault, asserting that Slagle doesn't like and doesn't say prayers); J.A. at 670 (Trial Tr. at 1810) (stating during closing arguments that Pope "was a very religious woman," that Pope "was ready to meet God, and Billy was going to send her to meet him"); *Id.* (stating that Slagle "had the nerve to tell you, 'I pray, I pray.'"); J.A. at 673 (Trial Tr. at 1814) (stating that Pope "is praying, and she is praying for her life"); J.A. at 702 (Trial Tr. at 1923) (referring to prayer as one of Pope's last acts "to do on this earth").

who arrived at the crime scene shortly after the killing described Slagle as having glassy eyes. J.A. at 474 (Trial Tr. at 1428). Slagle presented credible expert testimony that, even accounting for his history of teenage alcoholism, Slagle's level of intoxication at the time of the crime was likely to have impaired his judgment and his ability to reason, undermining the prosecution argument that he had the specific intent to kill that an aggravated murder conviction requires. *See* J.A. at 589-90 (Trial Tr. at 1698-99); J.A. at 611-12 (Trial Tr. at 1720-21) (expert testimony stating that "the highest functions of the brain," including "the ability to observe, the ability to make judgments, the ability to have insight into situations" are the first functions to be lost when intoxicated).

Furthermore, even in circumstances where the case against a defendant "was relatively straightforward and strong," we have granted habeas relief to a defendant alleging prosecutorial misconduct where the "egregious and inflammatory nature of the behavior and arguments of the prosecutor throughout trial" leaves us "with 'grave doubt' as to whether the prosecutorial errors 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Boyle v. Million*, 201 F.3d 711, 717, 718 (6th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). In pursuing Slagle's conviction, the prosecutor's behavior was so egregious and inflammatory that I have grave doubts about the integrity and fairness of Slagle's trial and resulting conviction.

### III.  THE PROSECUTORIAL MISCONDUCT DEPRIVED SLAGLE OF A FAIR TRIAL

A prosecutor "may prosecute with earnestness and vigor — indeed, [the prosecutor] should do so." *Berger*, 295 U.S. at 88. A prosecutor "may strike hard blows," but "is not at liberty to strike foul ones. It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id*. The need for a prosecutor to respect the boundary between hard and foul blows is perhaps never more important than when the prosecutor is seeking a capital conviction. *See Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 281 (1998) (plurality opinion) (stating that to the extent that defendant's life interest would require greater procedural protections in capital versus noncapital cases, such distinctions "are primarily relevant to trial"). Slagle's prosecutor struck a multitude of foul blows, against Slagle as a person and a defendant, engaging in a panoply of improper tactics to obtain his capital conviction. These blows "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 643. I would reverse the district court's judgment denying Slagle habeas relief on his prosecutorial misconduct claim. I respectfully dissent.