[This opinion has been published in *Ohio Official Reports* at 69 Ohio St.3d 98.]

REDMAN ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 1994-Ohio-514.]

*Evidence—Evid.R. 610—Religious beliefs or opinions—Trial court improperly permits admission of evidence of a witness's religious beliefs or opinions for the purpose of impeachment, when.*

(No. 92-2041—Submitted November 9, 1993—Decided April 27, 1994.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Wood County, No. 91-WD-071.

————————————

{¶ 1} Otterbein W. Duesler died testate in 1988 at the age of ninety-one. By his last will and testament, Duesler left most of his $338,000 estate to defendant-appellee and cross-appellant, Watch Tower Bible and Tract Society of Pennsylvania, the parent organization of the church known as Jehovah's Witnesses. The will, which superseded a previous will executed by Duesler, was drafted by defendant-appellee and cross-appellant, Walter Kobil, himself a member of the Jehovah's Witnesses. Claiming undue influence, three of Duesler's four surviving sisters, plaintiffs-appellants and cross-appellees, Irene Redman, Edna Blasis and Opal Atkin, instituted this will-contest action.

{¶ 2} At trial, plaintiffs elicited expert testimony from Dr. Gerald Bergman concerning the beliefs and practices of the Jehovah's Witnesses. Bergman, a former Jehovah's Witness, has written extensively about the church. He testified that the church engaged in a practice he termed "theocratic warfare." This practice allegedly includes a church policy to encourage members to perjure themselves in

order to protect the church and its followers. Plaintiffs also questioned several other witnesses about subjects including: the depth of Duesler's commitment to the church, the effects of baptism within the church, the consequences of disfellowship, and the effect religion had on Duesler's marriage.

{¶ 3} Most of plaintiffs' case was controverted by the defense. Kobil testified that he was a member of the Jehovah's Witnesses, but that lying under oath was not a tenet of their teachings. Kobil's testimony was corroborated by John Schabow, an elder in the local Jehovah's Witnesses congregation. Schabow also contradicted plaintiffs' evidence concerning Duesler's level of activity within the church.

{¶ 4} Ultimately the jury returned a verdict in favor of plaintiffs, finding that the will was the product of undue influence. The court of appeals reversed, holding that the trial court improperly permitted the admission of evidence of a witness's religious beliefs or opinions for the purpose of impeachment.

{¶ 5} The cause is now before this court upon the allowance of a motion and cross-motion to certify the record.

_____

*Caughey, Kuhlman, Beck & Reddin* and *William C. Caughey*; and *David E. Cruikshank*, for appellants and cross-appellees.

*Kolb & Kolb*, *Richard Kolb* and *Matt Kolb*, for appellees and cross-appellants.

_____

**MOYER, C.J.**

{¶ 6} Section 7, Article I of the Ohio Constitution guarantees freedom of religion and specifically provides that no person shall "be incompetent to be a witness on account of his religious belief ***." In keeping with this constitutional provision, Evid.R. 610 states: "Evidence of the beliefs or opinions of a witness on

matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced."

{¶ 7} This case presents us with the distinction between two related but separate evidence concepts: bias and credibility. Conversely, nothing in the rule prohibits the admission of religious evidence to show interest or bias on the part of the witness. See Staff Note to Evid.R. 610. Specifically, the question is whether the trial court improperly permitted the use of religious beliefs in general to attack defendants' credibility through the testimony of plaintiffs' expert, Dr. Gerald Bergman. Since we believe the trial court went beyond the issue of bias, we affirm the judgment of the court of appeals.

{¶ 8} The use of one's congregational affiliation to show bias is acceptable under Evid.R. 610. The use of one's religious beliefs or affiliation to attack credibility is not. As stated by the United States Supreme Court, "*** [b]ias is a term used *** to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel* (1984), 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450, 457. An attack on credibility is designed to expose a witness's general tendency towards truthfulness or untruthfulness. *Davis v. Alaska* (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. See *State v. Gardner* (1979), 59 Ohio St.2d 14, 13 O.O.3d 8, 391 N.Ed.2d 337.

{¶ 9} Generally, a witness's credibility is put at issue whenever he or she testifies. However, this general rule is subject to various exceptions. Examples include: restrictions on impeachment of one's own witness found in Evid.R. 607; limitations on impeachment by evidence of reputation, Evid.R. 608; attacks using prior convictions, Evid.R. 609; the use of prior statements of a witness, Evid.R. 613; and Ohio's rape shield law, R.C. 2907.02 *et seq.* The right to impeach the credibility of a witness is not absolute. Evid.R. 610 seeks to balance a party's right

to attack the credibility of an opposing witness while preserving the witness's overriding constitutional right to religious freedom.

{¶ 10} Evid.R. 610 is based on notions of relevancy and unfair prejudice, and a goal of avoiding inquiry into areas that bear little nexus to the ultimate issue. When, as here, the witness belongs to a minority sect, which may or may not be viewed with disdain or misunderstanding, the risk of unfair prejudice is high. Furthermore, common experience suggests that affiliation with any particular religious belief is not necessarily indicative of a predisposition to testify honestly. Here, plaintiffs attempted to show that the witness's religious beliefs were paramount to the oath taken prior to testifying. This represents a use of religious beliefs expressly prohibited by Evid.R. 610.

{¶ 11} The courts of Ohio have had little opportunity to interpret Evid.R. 610. However, the identical federal counterpart to the Ohio Rule has been the subject of extensive litigation. In *Malek v. Fed. Ins. Co.* (C.A.2, 1993), 994 F.2d 49, the court found questions addressed to the witness's affiliation with Hassidic institutions and the religious composition of his accounting clientele to violate Fed.R.Evid. 610. The court saw this as an attempt to show that the witness's character for truthfulness was affected by religious beliefs shared by the plaintiffs. In another recent decision from the Second Circuit, the court held that the statement, "'Jews aren't supposed to turn other Jews over,'" was a clear violation of the absolute prohibition contained in Evid.R. 610. *United States v. Teicher* (C.A.2, 1993), 987 F.2d 112, 119. See, also, *Contemporary Mission, Inc. v. Bonded Mailings, Inc.* (C.A.2, 1982), 671 F.2d 81; *United States v. Sampol* (C.A.D.C. 1980), 636 F.2d 621; *Government of Virgin Islands v. Petersen* (C.A.3, 1977), 553 F.2d 324.

{¶ 12} Much of plaintiffs' case centered on Dr. Bergman's testimony concerning theocratic warfare and his allegations that Jehovah's Witnesses would lie to protect their congregation. Questions addressed to Kobil's congregational affiliation with the Jehovah's Witnesses and work he had performed for the church

4

were permissible to show bias. Beyond that, the bulk of plaintiffs' questioning amounted to an attack on the tenets of the Jehovah's Witnesses' beliefs. This tactic went beyond the issue of bias and violated the principles of relevancy, unfair prejudice, religious freedom, tolerance, and personal privacy that underlie Evid.R. 610.

{¶ 13} The Rules of Evidence supply several methods for attacking a witness's propensity towards truthfulness, including those listed above under Evid.R. 608, 609 and 613. Questions concerning a witness's religious beliefs are not an additional permissible method to test truthfulness. The court of appeals was correct in so holding.

{¶ 14} Defendants on cross-appeal dispute the jury's ultimate finding of undue influence. Many of defendants' evidentiary arguments are rendered moot by our affirmance of the court of appeals' order of reversal and remand. However, there are two specific issues that we will address.

{¶ 15} The first concerns the effect on the ultimate issue of undue influence of a sixteen-year passage of time between the execution of Duesler's will and his death. Defendants argue that the passage of time should be construed as a reaffirmation and, hence, bar a finding of undue influence. We believe the better-reasoned approach is to consider the extended period of time between execution of the will and the testator's death as some evidence of the testator's freedom from undue influence but that it should not be deemed presumptive.

{¶ 16} If the will was never the product of undue influence, then the mere passage of time after its execution would have no effect. Only where a will is invalid at its inception would a reaffirmation bear on the issue of undue influence. This court has previously held that to later cure deficiencies in a will, the same formal requirements of execution found in R.C. 2701.03 apply to reaffirmations or republications. *Collins v. Collins* (1924), 110 Ohio St. 105, 143 N.E. 561. No such formal document exists in this record. The mere silence or acquiescence of a

testator could be demonstrated to a jury, but such silence, standing alone, will not cure an otherwise defective will. This is especially true, where as here, the jury concluded that Duesler was subject to continuing influences until his death.

{¶ 17} Defendants' second proposition suggests that we refine our holding in *West v. Henry* (1962), 173 Ohio St. 498, 20 O.O.2d 119, 184 N.E.2d 200. In *West*, we held that to succeed on a claim of undue influence, one must establish "(1) a susceptible testator, (2) another's opportunity to exert [undue influence], (3) the fact of improper influence exerted or attempted and (4) the result showing the effect of such influence." *Id.* at 510-511, 20 O.O.2d at 126, 183 N.E.2d at 208.

{¶ 18} Defendants contend that in order to show that the testator's wishes have been altered by undue influence, plaintiffs must first prove what the testator's original testamentary wishes were.

{¶ 19} Defendants' contention presents little more than a corollary to the fourth element of *West*. In any will contest action, the person who can give the best evidence of influence is dead. Therefore, most evidence will be circumstantial, leaving the factfinder to draw permissible inferences. One such inference may be that the testamentary disposition does not reflect the testator's true desires at the time of the execution of the will. However, this is not always the result of undue influence. A testator may bequeath or devise property out of a moral duty or to further the perceived wishes of a third party. If Duesler left his farm to the church because his mother wished it so, that devise does not necessarily represent his true feelings of self-interest, but it certainly would not be categorized as the result of undue influence. The question under *West* is whether undue influence manifested a result different than would have been reached absent the undue influence. *West* puts the inquiry where it should be, on the result of undue influence, not on what the testator's desires might have been prior to the undue influence.

{¶ 20} In this case, there was evidence that Duesler revoked an earlier will when he drafted the document at issue. It could therefore be reasonably inferred

that Duesler did change his wishes without ever establishing what those wishes were.  As it now stands, *West* presents a framework best suited to the ultimate issue, and we decline to modify our previous holding.

{¶ 21} For the foregoing reasons, the judgment of the court of appeals is affirmed, and this cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed.*

A.W. SWEENEY, WRIGHT,  BRYANT, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., not participating.

PEGGY BRYANT, J., of the Tenth Appellate District, sitting for RESNICK, J.

————————————