[Cite as *In re Estate of Gordon*, 2014-Ohio-2133.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | JUDGES: |
| IN THE MATTER OF THE ESTATE | : | Hon. W. Scott Gwin, P.J. |
| OF ESTHER GORDON: CAROLYN | : | Hon. Sheila G. Farmer, J. |
| ZARA | : | Hon. Craig R. Baldwin, J. |
| | : | |
| Plaintiff-Appellant | : | |
| | : | Case No. 13-CA-78 |
| -vs- | : | |
| | : | |
| PATRICIA SHAFFER GORDON, ET | : | O P I N I O N |
| AL | | |
| | | |
| Defendants-Appellees | | |

CHARACTER OF PROCEEDING:     Civil appeal from the Richland County Court
of Common Pleas, Probate Division, Case
Nos. 20111111, 20111111A, and
20111111B

JUDGMENT:                              Affirmed

DATE OF JUDGMENT ENTRY:        May 13, 2014

APPEARANCES:

For Plaintiff-Appellant                    For Defendant-Appellee Patricia Shaffer

ERICA PROBST                           WILLIAM FITHIAN III
STEVEN ROWE                            111 N. Main Street
88 West Mound Street                    Mansfield, OH 44902-7669
Columbus, OH  43215

Administrator/Executor                   For Defendant-Appellee Joshua Shaffer
JOSEPH L. JERGER                        DALE M. MUSILLI
Bayer, Jerger & Underwood               105 Sturges Avenue
362 Lexington Avenue                    Mansfield, OH 44903
Mansfield, OH 44907

*Gwin, P.J.*

{¶1} Appellant appeals the August 1, 2013 judgment entry of the Richland County Common Pleas Court, Probate Division, finding decedent possessed sufficient mental capacity in mid-October of 2008 to designate payable on death, survivorship, or any other designation on her bank accounts and finding decedent was not unduly influenced when she designated the payable on death co-beneficiary designations in mid-October of 2008.

*Facts & Procedural History*

{¶2} Esther Gordon, decedent, ("Esther") and Ralph Gordon ("Ralph") were married and have two daughters, appellant Carolyn Zara ("Carolyn") and appellee Patricia Shaffer Gordon ("Patricia"). Ralph died in July of 2006. Ralph had a hidden room built beneath the stairwell in the basement of the home he shared with Esther located at 235 West Cook Road in Mansfield, Ohio. The room contained several safes in which Ralph placed money, documents, and government bonds. Ralph told Carolyn and Esther about the safes, but not Patricia. Prior to Ralph's death, Ralph and Esther had multiple certificates of deposit located in Florida and named Carolyn, her husband James ("Jim"), and her children Anthony and Lisa as the payable on death beneficiaries. Very few of the certificates of deposit designated Patricia or her children appellee Joshua Shaffer ("Joshua") and daughter Sarah as beneficiaries.

{¶3} In August of 2006 after Ralph's death, Esther went to Richland Bank, established an account, and designated both Carolyn and Patricia as payable on death co-beneficiaries. On November 30, 2007, Carolyn accompanied Esther to Richland Bank where Esther deposited re-issued checks from stale bank checks in the amount of

$609,718.50 into the account with both Carolyn and Patricia designated as co-beneficiaries upon Esther's death. Four days later on December 4, 2007, Carolyn and Esther returned to Richland Bank and deposited $2,500 into the account established four days earlier. That same day, a new account was established that was funded by a transfer of $611,500 in funds from the account established on November 30, 2007. The new account designated only Carolyn as the payable on death beneficiary. In July of 2008, due to concerns about FDIC insurance limits, Carolyn accompanied Esther to set up accounts at different banks with $554,901.61 withdrawn from the Richland Bank account. Carolyn was again listed as the sole payable on death beneficiary on the new accounts established in July of 2008.

{¶4} In March of 2008, Carolyn arranged to take Esther to a new doctor, Dr. Cowden, because Esther's previous physician, Dr. Beard, moved out of town. At Esther's insistence, Carolyn took her back to Dr. Beard (who moved to an office approximately twenty-five miles away) on April 23, 2008, where she continued her care until October 21, 2008, when Carolyn took Esther back to Dr. Cowden to request an expert evaluation that Esther was incompetent.

{¶5} In October of 2008, Patricia came to town for the birth of her grandchild and stayed at Esther's home. At this time, Patricia became aware that Carolyn was the sole payable on death beneficiary on the bank accounts. On October 10, 2008, Patricia and Joshua drove Esther to an appointment with Attorney Joseph L. Jerger ("Jerger"), the son of the attorney who prepared Esther and Ralph's wills in 1970, to discuss the establishment of a power of attorney. Jerger had previously met with Esther after Ralph's death in 2006. On October 14, 2008, Esther returned with Patricia and Joshua

to Jerger's office where Esther executed a power of attorney designating Joshua as her attorney-in-fact. Also sometime between October 10th and October 14th of 2008, while Patricia was staying with Esther, Patricia and Joshua took Esther to various banks in order to change the payable on death beneficiary designations to Carolyn and Patricia as payable on death co-beneficiaries.

{¶6} After Patricia returned home to Mississippi, Carolyn prepared a revocation of power of attorney, a power of attorney designating Carolyn as attorney-in-fact and durable power of healthcare, and a living will for Esther. Carolyn took Esther to Mechanics Bank on November 1, 2008 to sign the documents in front of a notary. Carolyn filed an application for guardianship of Esther on April 23, 2009. Esther was interviewed by a court investigator in May of 2009 and indicated she did not want a guardian. Esther hired Jerger to represent her in the guardianship proceeding. At a June 29, 2009 hearing, Esther consented to the guardianship as long as Jerger would be appointed the guardian of her estate and Carolyn was appointed as the guardian of her person. At a February 3, 2011 hearing, Carolyn told the trial court Esther knowingly and voluntarily executed the durable power of healthcare attorney on November 1, 2008 and thus Carolyn was able to make treatment decisions for Esther. The trial court allowed Carolyn unrestricted authority to determine Esther's healthcare decisions. Esther died on February 11, 2011.

{¶7} After Esther's death, Jerger filed an application to probate will and motion to be appointed administrator, with will annexed ("WWA") on March 16, 2011, because both Carolyn and Patricia, the sole beneficiaries of Esther's estate, were named parties in a concealment action filed by Jerger in his capacity as Esther's guardian of the

estate. The trial court granted Jerger's motion on April 20, 2011 and appointed Jerger administrator, WWA, of Esther's estate. The will attached to the application to probate was prepared in 1970 by Esther where she named Ralph as the primary reciprocal beneficiary and named Carolyn, Patricia, and her son Richard Gordon, as equal beneficiaries. Richard Gordon died in 1971 without issue. The will was prepared by Joseph Jerger, Sr.

{¶8} On January 6, 2012, Patricia filed objections to inventory. Carolyn filed her objections to inventory and petition for declaratory judgment on January 11, 2012. The trial court set the objections and petition for hearing on July 26, 2012. The parties then jointly stipulated the hearing would also include any other issues of ownership regarding inventoried or non-inventoried assets of Esther. The probate court held a joint hearing on the objections to inventory and the separate concealment actions filed by the parties.

{¶9} At the hearing, Carolyn testified she spoke to Esther about establishing a power of attorney in July of 2008, but Esther did not want one. Carolyn stated she became concerned about Esther's mental state in September of 2008 because Esther was becoming confused about things and having difficulty writing checks. James Zara, Carolyn's husband, also testified Esther's mental capacities changed in the summer of 2008. However, Carolyn testified that, in October of 2008, Esther could live alone, stayed by herself at night, had no caregivers, and completed daily tasks by herself. With regards to Esther's doctors, Carolyn stated she took Esther to Dr. Cowden, a new physician, in March and April of 2008 after Dr. Beard, Esther's original physician, moved away. At Esther's insistence, Carolyn took her back to Dr. Beard in the summer of

2008, but then took her back to Dr. Cowden in October of 2008 after Patricia returned to Mississippi. Carolyn testified Esther never specifically told her Carolyn was the sole payable on death beneficiary on the bank accounts but always told her she and her family would be taken care of. Carolyn testified she found out Esther changed the payable on death designations in mid-October of 2008 when Esther told Carolyn she was not allowed in the house anymore and Joshua was going to take care of everything. Carolyn said Esther told her she did not understand what was going on and that Patricia and Joshua tricked her into changing the payable on death designations on the bank accounts and into establishing the power of attorney.

{¶10} After Patricia returned to Mississsppi, Carolyn prepared a revocation of power of attorney, a power of attorney designating Carolyn as attorney-in-fact and durable power of healthcare, and a living will for Esther. Carolyn took Esther to Mechanics Bank on November 1, 2008 to sign the documents in front of a notary. When questioned on cross-examination, Carolyn stated she thought Esther was aware of the documents she signed but probably was not competent to execute these documents. Carolyn testified as follows: "this had nothing to do with competence. This had everything to do with my mother trying to remove the power of attorney." Carolyn also stated that, "all I know is that my mother did not want the power of attorney with Josh. She said she never wanted it. She didn't understand what was going on, and she wanted it revoked." Carolyn testified she let Esther sign these documents knowing she was probably not competent to execute them and gave these documents to the probate court at a February 2011 Do Not Resuscitate / Comfort Care hearing. Carolyn believed Esther was susceptible to influence in October of 2008 because Esther was

trying to maintain her independence but was getting confused very easily and was extremely vulnerable. Carolyn believed Patricia took advantage of Esther's vulnerability by convincing Esther that Carolyn was not going to assist her anymore on October 10, 2008. On cross-examination, Carolyn stated she and Esther visited several of the banks where the changed beneficiary designation accounts were located after October 14, 2008, but Esther never requested any aspects or the beneficiaries on any of the accounts be changed.

{¶11} Patricia testified that in October of 2008 when she came home to visit her new grandchild, Esther asked her to take her to Jerger's office. When Jerger spoke to Patricia and Esther together, Esther had concerns about staying out of a nursing home and also was concerned Carolyn was manipulating her bank accounts. Patricia stated that when she and Esther went to leave Jerger's office, he recommended checking Esther's bank accounts and he specifically mentioned checking all payable on death accounts to make sure the beneficiary information conformed to Esther's wishes. After Esther made a list of the banks, Patricia went with her to the banks and Esther changed the beneficiary designations on the accounts. Patricia testified she did not instruct Esther to do anything at the banks and it was Esther who told the bank employees she wanted Carolyn and Patricia both to be equal payable on death beneficiaries on the accounts, just like Esther stated in her will. Patricia stated when Esther changed the beneficiary designations, Esther was not exhausted, confused, frightened, or shaken. Patricia disputed Carolyn's opinion that Esther was decreasing in memory in October of 2008.

{¶12} Joshua testified he drove Esther and Patricia to the various banks in October 2008, but stayed in the car while Esther and Patricia went into the banks. Joshua stated Esther requested he and Patricia assist her in changing the bank account designations and Esther changed the beneficiary designations of her own free will. According to Joshua, Esther expressed concern about Carolyn manipulating Esther's money. Joshua testified when he took Esther to Jerger's office, Esther was not upset or confused and was just her normal self. Esther told him on October 10, 2008 that there were lots of accounts just in Carolyn's name as the beneficiary and she added Patricia to them. Joshua stated he only utilized the power of attorney once to cash a check on October 14th or 15th of 2008.

{¶13} Jerger, an attorney for twenty-one years and a guardian for approximately fifty-four individuals, stated he had no concerns about Esther's competence in October of 2008 and observed nothing to indicate Esther was forced or coerced to do something she did not want to do. Jerger had met with Esther in 2006 after Ralph's death. Jerger testified that, at the October 2008 appointment, he spoke with Esther and Patricia and then spoke with Esther separately for approximately thirty to forty minutes. Esther told Jerger she was afraid Carolyn was taking over too much and not informing Esther about financial information. Further, that Esther wanted to write her own checks and pay her own bills, but Carolyn was stepping on her toes. Jerger suggested Esther set up a power of attorney other than Carolyn and further suggested Esther go to the banks where she had accounts and check to see if the accounts and their payable on death beneficiary designations were set up the way Esther wanted them set up. Jerger stated he spent time making sure Esther had the ability to grant a power of attorney because

Carolyn had told him a few months prior that Esther's mind was slipping.  Jerger testified he felt confident Esther knew who her family was, who she wanted to benefit, what assets she had, what day of the week it was, the year, who the president was, and that Esther was not frightened, confused, or tired.  Though Esther did not tell Jerger about the cash and bonds in the basement safes, she told him about her real estate in Mansfield and Florida and disclosed general information about her bank accounts.  Esther wrote the check out to Jerger herself without assistance.  Jerger stated Esther wanted the power of attorney and Jerger felt she had the ability to understand what a power of attorney was.  Jerger testified that, in October of 2008, he had no problem thinking Esther was competent to make the power of attorney.  Jerger stated when Carolyn contacted him to revoke the power of attorney, Jerger told her Esther would have to come into the office to complete this because he had concerns about revoking something Esther had been so adamant about several days prior to Carolyn's call.  Esther never came to his office to revoke the power of attorney.  In 2009, Esther contacted Jerger to represent her in the guardianship hearing

{¶14}  Amy Stentz ("Stentz"), Jerger's legal assistant, notarized the power of attorney Esther granted to Joshua in October of 2008.  Stentz testified she asked Esther if she had any questions about the document and Esther did not.  Further, Esther said she understood the document and, after Stentz placed her under oath, affirmed she wanted to execute the power of attorney and signed the document of her own free will.

{¶15}  Mary Williams ("Williams") was the notary at Mechanics Bank who notarized the documents prepared by Carolyn and signed by Esther on November 1, 2008.  Williams testified someone came in with Esther on November 1, 2008, but she

did not remember who it was. Williams stated she notarized the documents after placing Esther under oath. Williams felt Esther was signing the documents of her own free will and that Esther appeared to be of sound mind and seemed normal to her.

{¶16} Condrea Corley ("Corley"), a probate court investigator, met with Esther in May of 2009 after Carolyn filed an application for guardianship. Corley testified Esther felt she did not need a guardian and felt Carolyn thought she knew everything and just wanted to control her money. Corley saw several signs around the house such as "do not open the door" and "do not let Josh in." Corley thought Esther's mind was reasonably sharp and Esther was pretty mentally sharp when she interviewed her.

{¶17} The trial court admitted portions of the office records of Dr. Julie Beard, Dr. Deborah Cowden, Dr. Raymond Baddour, and Dr. A.J. Chawla. However, none of the doctors testified at the evidentiary hearing or were deposed by any of the parties involved in this proceeding. Dr. Baddour commenced treatment of Esther on March 27, 2009 as a result of a referral from Esther's heart doctor. Baddour performed a mini-mental status exam and scored Esther a 25 out of 30, just above the baseline from mental impairment, and opined moderate dementia. The notes indicate Carolyn reported cognitive decline of Esther for six (6) years. Dr. Beard, Esther's family physician for many years, first mentions confusion in her office notes in April of 2008. Despite several requests from Carolyn, including an October 29, 2008 request from Carolyn for a letter that Esther was confused, Dr. Beard told Carolyn that Esther needed to be evaluated by a psychiatrist or neurologist because Dr. Beard was not an expert in competency evaluation.

{¶18} Carolyn took Esther to Dr. Cowden in March of 2008. The notes indicate Esther's judgment was not intact, she had some deficits, and that Esther was arguing with Carolyn. At Esther's insistence, Carolyn took Esther back to Dr. Beard from April 2008 to October 21, 2008 when Carolyn took Esther back to Dr. Cowden. On October 21 2008, Dr. Cowden conducted a short exam of mental status. On this same date, Dr. Cowden filled out a statement of expert evaluation indicating Esther needed a guardian because of dementia and impaired judgment. Carolyn did not file an application for guardianship in October of 2008. On October 28, 2008, Carolyn contacted Dr. Cowden's office to report a large amount of cash and bonds missing from Esther's safe also informed Dr. Cowden's office about the change in the payable on death designations on Esther's bank accounts. Carolyn told the doctor's office the doctor's previous notes made it look very bad for Carolyn with her mom due to Esther's desire to return to see Dr. Beard. On October 28, 2008, Dr. Cowden conducted a mini-mental status exam on Esther and scored Esther at fourteen (14). Dr. Cowden corrected the score approximately five months later and rescored Esther at an eighteen (18) and noted this increase occurred after Dr. Cowden reviewed how to score the test.

{¶19} On January 13, 2009, Dr. Cowden noted at an office visit that Esther's "judgment was noted to appear intact." Dr. Cowden administered a mini-mental status exam, but the final score was left blank. One test stated a score of eighteen (18), but the individual answers added to twenty-one (21). The other test appears to add to eighteen (18) and there is no explanation in the variance of the numbers.

{¶20} After the hearing, the trial court issued a judgment entry on August 1, 2013. The trial court overruled the objections to inventory, found Carolyn failed to meet

her burden in proving that Esther did not possess the mental capacity to re-designate the payable on death beneficiaries on her various bank accounts in October of 2008, and found no persuasive evidence of undue influence. The trial court thus determined that the designations on Esther's bank accounts, IRA's, and other accounts should be as of the last date Esther designated the payable on death beneficiaries.

{¶21} Appellant appeals the August 1, 2013 judgment entry of the Richland County Court of Common Pleas, Probate Division, and assigns the following as error:

{¶22} "I. THE JUDGMENT ENTERED BY THE TRIAL COURT WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED.

{¶23} "II. THE JUDGMENT ENTERED BY THE TRIAL COURT [WAS] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED."

I. & II.

*Manifest Weight & Sufficiency of the Evidence*

{¶24} Appellant argues the trial court's judgment was against the manifest weight and sufficiency of the evidence. Specifically, appellant contends that at the time Esther executed the power of attorney and changed the payable on death designations of several bank accounts, she was incompetent and subject to the undue influence of Patricia and Joshua.

{¶25} In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case. The Ohio Supreme Court held the standard of review for manifest weight of the evidence for

criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E. 2d 541 (1997) is also applicable in civil cases. *Eastley,* 132 Ohio St.3d. A reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id;* see also *Sheet Metal Workers Local Union No. 33 v. Sutton*, 5th Dist. Stark No. 2011 CA 00262, 2012-Ohio-3549. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley*, supra, 2012-Ohio-2179.

{¶26} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. *Markel v. Wright*, 5th Dist. Coshocton No. 2013CA0004, 2013-Ohio-5274. Further, "an appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusion of law." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.* Accordingly, a trial court may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (4th Dist. 1998).

*Mental Capacity*

**{¶27}** Appellant argues the trial court's determination that Esther possessed sufficient mental capacity in mid-October of 2008 to designate payable on death designations on her bank accounts was not supported by the sufficiency of the evidence and was against the manifest weight of the evidence. Appellant specifically argues the statements of Dr. Cowden and other physicians were not contradicted and that the trial court improperly weighed the testimony of Jerger as compared with the medical professionals. We disagree.

**{¶28}** The burden of proof in determining mental or testamentary capacity is on the party contesting a will or other testamentary instrument such as a beneficiary designation. *Kennedy v. Walcutt*, 118 Ohio St. 442, 161 N.E. 336 (1928). Testamentary or mental capacity exists when a person has sufficient mind and memory: first, to understand the nature of the business in which she is engaged; second, to comprehend generally the nature and extent of her property; third, to hold in her mind the names and identity of those who have natural claims upon his bounty; and fourth, to be able to appreciate her relation to the members of her family. *Birman v. Sproat*, 47 Ohio App.3d 65, 67-68, 546 N.E.2d 1354 (2nd Dist. 1988). It is not enough to show the individual had deteriorating health, even if the individual suffered from poor medical health at the time the documents were executed. *Martin v. Drew*, 10th Dist. No. 03AP-734, 2004-Ohio-2520. Appellant must also show that the health decline actually affected the testator's capacity to execute the beneficiary designation. *Id* ("[E]vidence that [the] decedent suffered from dementia or Alzheimer's disease on [the] day she executed [her] will, standing alone, is insufficient to raise a fact issue as to a lack of

testamentary capacity without some evidence that the disease rendered her incapable of knowing her family or her estate or understanding the effect of her actions."); see also *Neumeyer v. Estate of Penick*, 5th Dist. Licking No. 07-CA-146, 2009-Ohio-321.

{¶29} We find competent and credible evidence exists to support the trial court's determination that Carolyn failed to meet her burden of proof that Esther did not possess the mental capacity to re-designate the payable on death beneficiaries on her banks accounts in mid-October of 2008. While the medical records show a slow deterioration of Esther's mental ability, the records are not complete and are contradictory. Only the records from 2010 of Chawla's were introduced. Further, though Beard noted mental confusion of Esther in April of 2008, she repeatedly informed Carolyn that Esther should be evaluated by a psychiatrist or neurologist because Beard was not an expert in mental competency. On October 28, 2008, Cowden conducted a mini-mental status exam and scored Esther at fourteen (14) and indicated Esther's judgment appeared not to be intact. Approximately five months later, Cowden revised and rescored the October 2008 mini-mental status exam to an eighteen (18) and indicated this increase was due to her review of how to property score the test. At a January 13, 2009 office visit, Dr. Cowden stated that Esther's "judgment was noted to appear intact" and conducted a mini-mental status exam. However, the final score of the test was left blank. One test stated a score of eighteen (18), but the answers added up to twenty-one (21), while a second test added up to eighteen (18) and there is no explanation of this variance in the numbers. Dr. Baddour performed a mini-mental status exam on Esther in March of 2009 and scored her 25 out

of 30, just above the baseline from mental impairment. Dr. Baddour indicated in his notes the information about Esther's cognitive decline for six years came from Carolyn.

**{¶30}** None of the doctors were deposed or testified at the evidentiary hearing and thus were unable to explain the inconsistencies in the varying scores on the mini-mental status exams, the inconsistencies in their opinions about Esther's judgment, or indicate their opinion of Esther's mental competency on October 10th through October 14th of 2008. Further, the various notes by the medical professionals are devoid of any indication that Esther's health decline actually affected her capacity to execute the beneficiary designations on the dates in question. As noted above, it is not enough to show Esther suffered from dementia on the dates in question, but there must be some evidence the disease rendered her incapable of knowing her family or her estate or understanding the effect of her actions. Appellant has not demonstrated Esther's deteriorating health actually affected her capacity to change the beneficiary designations.

**{¶31}** We further disagree with appellant's contention that Dr. Cowden's opinion was not rebutted by other evidence. Jerger had extensive experience with wards and guardians and further was aware of the Ohio Rules of Professional Conduct for attorneys, including Rule 1.14, "Client with Diminished Capacity." Jerger met with Esther alone on October 10, 2008 and testified Esther possessed the mental faculties necessary to make decisions regarding the execution of a power of attorney and that Esther was not confused, fearful, or threatened. Jerger stated that, based on his history with Esther and his experience of being a guardian in numerous cases, Esther had the ability to know what she wanted to do, why she wanted to do it, and was competent.

Jerger testified he felt confident Esther knew who was her family, who she wanted to benefit, what assets she had, what day of the week it was, the year, and who the president was. Jerger testified he suggested to Esther that she check the payable on death beneficiaries on her bank accounts to make sure they were set up in accordance with her wishes. Stentz testified that on October 14, 2008, Esther understood the power of attorney to Joshua and signed the document of her own free will. Corley, the probate court investigator, found Esther to be reasonably mentally sharp when she interviewed her in May of 2009 and felt Esther needed someone to assist her with finances, but not a guardian of her person.

{¶32} In addition, after the October 10 – October 14, 2008 dates in question, Carolyn herself created a revocation of power of attorney, a power of attorney designating Carolyn as attorney-in-fact and durable power of healthcare, and a living will for Esther. Carolyn took Esther to Mechanics Bank on November 1, 2008 to sign the documents in front of a notary. These documents were given to the trial court by Carolyn at a February 2011 Do Not Resuscitate / Comfort Care hearing. Williams, the notary at the bank who notarized the documents on November 1, 2008, testified Esther appeared to be of sound mind and seemed normal to her.

{¶33} Further, though Esther had the opportunity to return to the banks in question and change the payable on death beneficiary information until a guardianship was establish in June of 2009, she declined to do so. Esther even failed to change the beneficiary information on the account she had with Mechanics Bank when she went there with Carolyn on November 1, 2008. The payable on death split of the bank accounts between Carolyn and Patricia was in accord with Esther's general estate plan

as evidenced by the equal split between Carolyn and Patricia in Esther's will and in her IRA distributions.

{¶34} Given the inconsistent and incomplete medical records with the lack of testimony from any medical professional about Esther's mental capacity on the dates in question, the testimony of Jerger, Stentz, and Williams, the fact that the payable on death designations coincide with Esther's will and IRA division, and the fact that Esther never returned to the banks to change the designations, we find the trial court's determination that  Carolyn failed to meet her burden that Esther lacked the mental capacity to change the payable on death beneficiaries on her bank accounts in mid-October of 2008 was not against the manifest weight or sufficiency of the evidence.  As noted, above, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses.  *Markel v. Wright*, 5th Dist. Coshocton No. 2013CA0004, 2013-Ohio-5274.

*Undue Influence*

{¶35} Appellant also argues the trial court's conclusion that Patricia and Joshua did not exercise undue influence on Esther during the first two weeks of October of 2008 was not supported by the sufficiency of the evidence and was against the manifest weight of the evidence.  We disagree.

{¶36} The Ohio Supreme Court has stated that, "[g]eneral influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will.  If the will or codicil, as finally executed, expresses the will, wishes and desires of the testator, the will is not void because of undue influence."  *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962).  A finding of undue influence

requires the following: (1) the influenced individual is/was susceptible, (2) another's opportunity to exert undue influence, (3) the fact of improper influence exerted or attempted, and (4) a result showing the effect of such influence. *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 630 N.E.2d 676 (1994). Further, "the mere existence of undue influence, or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient, but such influence must actually be exerted on the mind of the testator * * * [i]t must be shown that such influence, whether exerted at the time of the making of the will or prior thereto, was operative at the time of its execution or was directly connected therewith." *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E. 2d 200 (1962).

{¶37} In reviewing the record, we find there is competent and credible evidence to support the trial court's decision that Patricia and Joshua did not unduly influence Esther in October of 2008 to change the bank account beneficiary designations or execute the power of attorney. Jerger observed nothing to indicate Esther was being forced, pressured, coerced, or compelled to do something she did not want to do and testified that Esther was concerned about Carolyn manipulating her finances. Jerger spoke with Esther by herself, without Patricia or Joshua present in the room. Stentz testified when Esther returned to execute the power of attorney, Esther swore she was signing the document of her own free will. Most notably, Esther never returned to the banks to change the payable on death designations, even though Carolyn testified that she took Esther to at least some of these banks after October of 2008, including Mechanics Bank on November 1, 2008, when Carolyn took Esther there to execute the documents Carolyn prepared. While Carolyn testified Esther was very upset about the

power of attorney and felt Patricia and Joshua tricked her into changing the beneficiary designations, Esther had approximately six months between the October 2008 designations and June of 2009 when Carolyn and Jerger became her guardians to change the beneficiary designations on the bank accounts. However, Esther did not do so. According to the testimony of Corley, in May of 2009, Esther was still concerned about Carolyn having control over her finances. Esther's will, established in 1970, listed both Carolyn and Patricia as beneficiaries and Esther never revoked this will. The placement of both Carolyn and Patricia as payable on death beneficiaries on the bank accounts coincides with her general estate plan. Any concern by Patricia was solely that Carolyn was going to control Esther's money which was upsetting to Patricia because the two sisters were constantly at odds with each other. However, there is no evidence this general influence or concern was improper, was exerted on Esther, or resulted in the changing of the bank account designations.

{¶38} Accordingly, we find the evidence does not demonstrate that Patricia or Joshua submitted their will for that of Esther. Based on the above, we find the trial court's determination that no actual improper or undue influence was exerted upon Esther relative to the changing of the payable on death beneficiaries on the bank accounts was not against the manifest weight or sufficiency of the evidence.

**{¶39}** Based on the foregoing, we find the trial court did not err in its judgment entry on August 1, 2013 in finding Esther possessed sufficient mental capacity in mid-October 2008 to designate payable on death, survivorship, or any other designation on her bank accounts and in finding Esther was not unduly influenced when she designated the payable on death designations in mid-October 2008. Appellant's first and second assignments of error are overruled and the August 1, 2013 judgment entry of the Richland County Court of Common Pleas, Probate Division, is affirmed.

By Gwin, P.J.,

Farmer, J., and

Baldwin, J., concur